UNITED STATES of America, Appellee,

v.

Arno Sascha JAKOBSON, Appellant.

No. 23, Docket 28137.

United States Court of Appeals Second Circuit.

Argued Oct. 2, 1963.

Decided Nov. 22, 1963.

Herman Adlerstein, New York City, for appellant.

Ezra H. Friedman, New York, N. Y. (Robert M. Morgenthau, U. S. Atty., for Southern District of New York) (James M. Brachman and Robert J. Geniesse, Asst. U. S. Attys., of counsel), for appellee.

Before LUMBARD, Chief Judge, and FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge.

Arno Sascha Jakobson appeals from a judgment, entered in the Southern District of New York by Judge Palmieri, sitting without a jury, convicting him of refusal to submit to induction for combatant training as ordered by his Selective Service System Local Board, in violation of 50 U.S.C.App. § 462(a). He maintains that the notice of induction was invalid under § 6(j) of the Universal Military Training and Service Act, 50

U.S.C.App. § 456(j), which provides that the Selective Service Act shall not "be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. Religious training and belief in this connection means an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, or philosophical views or a merely personal moral code."

Jakobson's parents were Jews who migrated to the United States in his early youth. When about 13 years of age, he became estranged from the Jewish faith, avowedly because of his distaste for what he considered the "bloodthirsty nationalism" exhibited in certain portions of the Old Testament, such as the Book of Joshua. He registered with his Local Board on September 2, 1953, a few days after his eighteenth birthday. In his classification questionnaire he made no claim of conscientious objection in the item provided for that purpose but did claim physical disqualification because of a back injury, a claim which he supported shortly thereafter by a note from his physician. When his Local Board classified him 1–A, he sought and obtained a student deferment, a status in which, save for one short interval, he remained until February 9, 1956, when he was reclassified 1–A. Nearly two years later he was ordered to report for a pre-induction physical examination. He presented a second physician's certificate describing his back condition but was found qualified for service and was so notified by the Local Board on March 18, 1958.

A month later Jakobson advised the Local Board that he believed himself exempt as a conscientious objector. With a 15-page addendum and three supporting letters, he filed the Special Form for Conscientious Objectors (SSS Form 150), claiming exemption from combatant service only; he answered the question "Do you believe in a Supreme Being" in the affirmative, with explanations of which we shall say more hereafter. At a hearing before the Local Board in the fall, he stated that even noncombatant service would result in "too many situations and relationships that would be a strain on my conscience * * * " and sought a 1–O classification which would exempt him from all military service but would subject him to a like period of civilian work contributing to the maintenance of the national health, safety, or interest; he also filed with the Board a 43-page discussion of his views.

The Local Board did not question Jakobson's sincerity but concluded that his claim was not based upon religious training and belief as defined in the statute; somewhat inconsistently with this view, it granted him classification 1–A–O, for noncombatant service, to which he was entitled only if he met the statutory test. Jakobson appealed. The Appeal Board tentatively determined that he was not entitled to classification as a conscientious objector in any form, and forwarded the file for an advisory recommendation by the Department of Justice, 32 C. F. R. § 1626.25(b). After an investigation by a hearing officer, and a generally favorable F. B. I. report on the evaluation of Jakobson by his acquaintances, the Department made the following recommendation to the Appeal Board:

"The Hearing Officer concluded that the registrant is not opposed to participation in combatant or noncombatant military training and service by reason of his religious training and belief; that his claim is based upon a personal moral code and that he is not sincere in his claim. He recommended that the appeal of the registrant based upon grounds of conscientious objection be not sustained.

"The Department of Justice finds that the registrant's claim is not sustained. It, therefore, recommends

that the registrant's claim be not sustained by your Board."

Jakobson then sent a further communication to the Appeal Board, again explaining why he regarded his convictions as religious and seeking to excuse his tardiness in advancing his conscientious objection claim (and the change in his request from a 1–A–O to a 1–O classification). One reason offered was that when about six months before his pre-induction physical examination, he inquired of the clerk of the Local Board as to qualifications for a conscientious objector exemption, he was told this was given "only to individuals with a long and overtly-provable pacifist background" who could produce letters from ministers; he added that since his family background was not pacifist, he had been forced to face this difficult problem by himself, "from scratch," when it arose. On December 9, 1958, the Appeal Board classified him 1–A. After unsuccessful efforts to carry the matter further, he was ordered to submit to induction, but, on completion of his induction physical, refused to take the step forward which symbolizes submission to induction. For this refusal he was indicted and convicted.

█ The Department of Justice had recommended denial of Jakobson's claim on two grounds: that he lacked sincerity, and that his objections were not based on religious training and belief within the meaning of the statute. The Appeal Board did not indicate on what ground it relied. If we were certain that the denial of exemption rested on a finding of insincerity, Jakobson's five year delay in claiming conscientious objection and his shift of position after making the claim would oblige us to affirm his conviction. The finality which the Act bestows on the decisions of the local and appeal boards, 50 U.S.C.App. § 460(b) (3), precludes judicial rejection of their findings as invalid unless "there is no basis in fact for the classification" given to the registrant, Estep v. United States, 327 U.S. 114, 122–123, 66 S.Ct. 423, 427, 90 L.Ed. 567 (1946), and "any fact which

casts doubt on the veracity of the registrant is relevant." Witmer v. United States, 348 U.S. 375, 381–382, 75 S.Ct. 392, 395–396, 99 L.Ed. 428 (1955). In Jakobson's case, as in Witmer's, there were enough "objective facts before the Appeal Board to * * * cast doubt on the sincerity of his claim," 348 U.S. at 382, 75 S.Ct. at 396, 99 L.Ed. 428, see also United States v. Corliss, 280 F.2d 808, [Heise] 812, [Herold] 816 (2 Cir.), cert. denied, 364 U.S. 884, 81 S.Ct. 167, 5 L.Ed.2d 105 (1960). It is immaterial that on the cold record alone we would not have found Jakobson insincere or that the Local Board, which saw him, did not doubt his honesty. The resolution of conflicting inferences from personal observation and from the undisputed history was for the Appeal Board, as, indeed, it would be even if the scope of judicial inquiry were considerably broader than it is here. See F. C. C. v. Allentown Broadcasting Corp., 349 U.S. 358, 364–365, 75 S.Ct. 855, 99 L.Ed. 1147 (1955).

█ On the other hand, if the Appeal Board, although believing Jakobson to be sincere, based its classification on the ground that his conscientious objection was not the result of religious training and belief, we would be compelled to reverse the conviction and direct dismissal of the indictment. For we rule it an erroneous construction of the statute to conclude that Jakobson's beliefs fell outside its definition of religion.

To summarize Jakobson's religious views is not altogether easy. He begins by defining religion as the sum and essence of one's basic attitudes to the fundamental problems of human existence. He recognizes an ultimate cause or creator of all existence which he terms "Godness." In theory an individual's relationship to Godness can take one or the other of two forms, a "vertical" relationship in which man relates directly to Godness, or a "horizontal" one in which man relates to Godness indirectly by binding himself to the qualities of Godness that exist in every creation in Mankind and throughout the world. For

himself Jakobson rejects the vertical "one-to-one" relationship because God is unknowable to man, and because action and spiritual growth purportedly based on a direct relationship with Godness must thus lead to error since man can reason but imperfectly about the unfathomable. Moreover, he finds objectionable the egocentric two-dimensional view which the vertical relationship fosters. For him Godness can be approached only through psychic involvement in the three-dimensional world. Inward turning causes spiritual diminution, egocentricity, and passive "putting up with" the evils of the world rather than an active attempt to change it. The way to arrive closer to Godness is by approaching the universals inherent in existence. The individual must deal directly with life, death, health, love, time —the "givens" of existence stemming from the Ultimate Cause—as he finds them in himself and others.

Jakobson sees himself as faced with an inescapable choice between acceptance or rejection of the order of the universe; for him this is the central problem of religion. He explains the positions of acceptance and rejection by reference to the characters of Ivan and Zossima in "The Brothers Karamazov." Ivan accepts God but rejects the world because of the evil in it; he can go on living and can love particular individuals, but can only withdraw from the evil that he sees. Ivan doesn't oppose but passively and unhappily acquiesces; with such a position one could go to war by disavowing any personal responsibility. Zossima represents acceptance, which Jakobson defines as total affirmation of the basic blessedness of the fact of being—of goodness and "yesness." The taking of human life is incompatible with acceptance, which sees in all humanity "God-ness"—the quality of having been created by the Ultimate Cause. Jakobson adopts the position of acceptance.

The definition of "religious training and belief" in § 6(j), somewhat unusual for a statute, is the end product of a long development. Without going back further into history, we shall start with the Draft Act of 1917, 40 Stat. 78. This exempted "a member of any well-recognized religious sect or organization at present organized and existing and whose existing creed or principles forbid its members to participate in war in any form and whose religious convictions are against war or participation therein in accordance with the creed or principles of said religious organization * * * " The constitutionality of this provision under the First Amendment was upheld, rather summarily, in Arver v. United States, 245 U.S. 366, 389–390, 38 S.Ct. 159, 62 L.Ed. 349 (1918). The corresponding provision in the bills that became the Selective Service Act of 1940 were similarly restrictive.[1] However, in the course of enactment Congress broadened the clause to exempt from combatant training any person "who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form * * *," 54 Stat. 889;[2] "religious training and belief" was left undefined.

In United States v. Kauten, 133 F.2d 703 (2 Cir. 1943), this court was concerned with a claim to exemption by an atheist whose objection to military service stemmed primarily from a belief that this country's involvement in World War II was a political scheme of President Roosevelt. In denying Kauten's claim Judge Augustus N. Hand said that "The provisions of the present statute * * * take into account the characteristics of a skeptical generation and make the

---

1. See Conklin, Conscientious Objector Provisions: A View in the Light of Torcaso v. Watkins, 51 Geo.L.J. 252, 269 and fn. 76 (1963).

2. Congress declined to adopt an even broader amendment, urged by the American Civil Liberties Union, which would have exempted any person "who is conscientiously opposed to participation in war in any form" without any reference to religion. See Conklin, supra, 51 Geo. L.J. at 269–270.

existence of a conscientious scruple against war in any form, rather than allegiance to a definite religious group or creed, the basis of exemption." He distinguished between "a course of reasoning resulting in a conviction that a particular war is inexpedient or disastrous," the most that Kauten had, and "a conscientious objection to participation in any war under any circumstances * * * a response of the individual to an inward mentor, call it conscience or God, that is for many persons at the present time the equivalent of what has always been thought a religious impulse," 133 F.2d at 708. We applied this view to grant exemption in United States ex rel. Phillips v. Downer, 135 F.2d 521 (2 Cir. 1943) and held it determinative in United States ex rel. Reel v. Badt, 141 F. 2d 845 (2 Cir. 1944). Soon afterwards, however, the Ninth Circuit denied Herman Berman's right to exemption, although his views came closer to Phillips' and Reel's than to Kauten's. Berman v. United States, 9 Cir., 156 F.2d 377, cert. denied 329 U.S. 795, 67 S.Ct. 480, 91 L.Ed. 680 (1946). In the course of its opinion, the court quoted a phrase in Chief Justice Hughes' dissent in United States v. Macintosh, 283 U.S. 605, 633–634, 51 S.Ct. 570, 75 L.Ed. 1302 (1931), that "The essence of religion is belief in a relation to God involving duties superior to those arising from any human relation," and added that an individual's "philosophy and morals and social policy without the concept of deity cannot be said to be religion in the sense of that term as it is used in the statute." 156 F.2d at 381. These two statements were combined into the second sentence of § 6(j) in the 1948 enactment to form the present statutory definition of "religious training and belief"; their

derivation from the Berman opinion was not left in doubt.[3]

 In construing the conscientious objector provision today, we must take account of statements of the Supreme Court subsequent to our decision, United States v. Bendik, 220 F.2d 249 (2 Cir. 1955), sustaining the statute's constitutionality, and decisions to the same effect by other courts of appeals. Most pertinent is that in the Maryland notary public oath case, Torcaso v. Watkins, 367 U.S. 488, 495, 81 S.Ct. 1680, 1683–1684, 6 L.Ed.2d 982 (1961):

> "We repeat and again reaffirm that neither a State nor the Federal Government can constitutionally force a person 'to profess a belief or disbelief in any religion.' Neither can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs."

Since it is hard to deny that making exemption from military service turn on religious training and belief as stated in § 6(j) aids religions, and, more particularly, religions based on a belief in the existence of God, at least as significantly as permission to become a notary public, cf. Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), the Torcaso statement requires consideration whether there is some other basis whereby a statute making religious training and belief a condition to exemption from military service can escape condemnation. The important distinction seems to us to be that, in contrast to Maryland's notary public oath, Congress enacted this statute, in mitigation of

3. The Senate Report, S.Rep.1268, 80th Cong.2d Sess., p. 14 (1948), states:
"(j) Conscientious objectors.—This section reenacts substantially the same provisions as were found in subsection 5(g) of the 1940 Act. Exemption extends to anyone who, because of religious training and belief in his relationship to a

Supreme Being, is conscientiously opposed to combatant military service or to both combatant and noncombatant military service. (See Berman v. United States, 156 F.2d 377, certiorari denied, 329 U.S. 795 [67 S.Ct. 480, 91 L.Ed. 680]). * * *" U.S.Code Congressional Service 1948, p. 2002.

what we assume to be the constitutionally permissible course of denying exemptions to all objectors, for the very purpose of protecting "the free exercise" of religion by those whose religious beliefs were incompatible with military service which Congress had the right to require. See Mr. Justice Brennan concurring in Abington School District v. Schempp, 374 U.S. 203, 247–248, 295–298, 301–302, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). But, under present day thinking as to the First Amendment, a statute could scarcely be defended on this score if it protected "the free exercise" of only a few favored religions or preferred some religions over others without reasonable basis for doing so. See Watson v. Jones, 13 Wall. 679, 728–729, 80 U.S. 679, 728–729, 20 L.Ed. 666 (1872). The freedom which the Constitution protects is the freedom to exercise the religion of one's choice; a statute limited to certain religions would restrict the free exercise of the disfavored ones. The time-honored principle of construing a statute not only to escape unconstitutionality but to avoid "grave and doubtful constitutional questions," United States v. Delaware & Hudson Co., 213 U.S. 366, 407–408, 29 S.Ct. 527, 53 L.Ed. 836 (1909), thus dictates reading the definition of "religious training and belief" in § 6(j) as broadly as the words permit.

The statute clearly does not require belief in an anthropomorphic deity breathing, like the God of the Sistine ceiling, over the face of the waters. Long before 1948 men whose belief in a Supreme Being would not have been questioned had substituted the notion of "God out there" for "God up there." [4] The majority opinion in Berman recognized this, 156 F.2d at 380; it asked only that one asserting religious belief should not "assign all beyond [our logical equations] as a great vacancy" but should entertain a belief "going beyond the physical revelations of life." Even more clearly Chief Justice Hughes' statement in Macintosh, made in the course of an eloquent dissent insisting on "our regard from the beginning for freedom of conscience," 283 U.S. at 631, 51 S.Ct. at 577, 75 L.Ed. 1302, was not intended to define "religion" or "God" in any narrow sense. We are by no means certain that the court that rejected Berman's claim because his evidence showed no belief in "a supreme power" of any kind would have rejected Jakobson's. Moreover, the statutory definition need not be regarded as precisely bounded by the Berman opinion when the compulsion to read it broadly is so strong. A contemporary theologian of high distinction and wide influence, who has taught at great universities on both sides of the Atlantic, Professor Paul Tillich, has written of God in terms that would surely embrace Jakobson's beliefs. As the footnote shows,[5] Jakobson's definition of religion as "the sum and essence of one's basic attitude to the fundamental problems of human existence" and his insistence that man can know nothing of God and that Godness can be approached only through psychic involvement in reality parallel the views of this eminent

4. These phrases are used by John A. T. Robinson, Bishop of Woolwich, in a recent book, "Honest to God," a chapter from which is reprinted in Horizon Magazine, Sept. 1963, p. 4.

5. Rejecting both the supranatural view which "separates God as a being, the highest being, from all other beings, alongside and above which he has his existence" and the naturalist view which identifies God with the universe, Tillich identifies God as the self-transcendent ground of being. "God as the ground of being infinitely transcends that of which he is the ground * * * To call

God transcendent in this sense does not mean that we must establish a 'super world' of divine objects. It does mean that, within itself, the finite world points beyond itself. In other words it is self-transcendent." From this view, two seemingly self-contradictory consequences necessarily follow: "first, whatever one knows about a finite thing, one knows about God because it is rooted in him as its ground; second, anything one knows about a finite thing cannot be applied to God because he is * * * quite other, or * * * ecstatically transcendent." 2 Systematic Theology 9 (1957). Knowledge of God comes through the unity

theologian rather strikingly. We cannot believe that Congress, aware of the constitutional problem, meant to exclude views of this character from its definition of religion,[6] or to require lay draft boards and personnel of the Department of Justice to pass on nice theological distinctions between vertical and horizontal transcendence. See Mr. Justice Jackson, dissenting, in United States v. Ballard, 322 U.S. 78, 92–95, 64 S.Ct. 882, 889–890, 88 L.Ed. 1148 (1944). It follows that if the decision of the Appeal Board rested solely on the view that the beliefs professed by Jakobson did not meet the test of § 6(j), it was predicated on an erroneous view of the law and afforded no basis for ordering his induction.

■■ Our inability to determine the grounds upon which the Appeal Board based Jakobson's classification complicates the disposition of his appeal. The usual rule is that when a case is submitted to fact finders on two legal theories, one right and the other wrong, their determination cannot stand. United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki, 358 U.S. 613, 619, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959). The applicability of this general principle in selective service cases is supported by a statement in Sicurella v. United States, 348 U.S. 385, 392, 75 S.Ct. 403, 406–407, 99 L.Ed. 436 (1955): "Here, where it is impossible to determine on exactly which grounds the Appeal Board decided, the integrity of the Selective Service System demands, at least, that the Government not recommend illegal grounds," although the pertinence of that statement to the instant case is weakened by the fact that in Sicurella the sole ground recommended by the Department was held

of these divergent consequences, the perception of the ground of being of every object of the natural and spiritual world accompanied by an understanding of transcendence of that thing of which it is the ground.

Other writings of Tillich which seem quite close to Jakobson's beliefs are these:

"Theism in all its forms is transcended in the experience we have called absolute faith. It is the accepting of acceptance without somebody or something that accepts. It is the power of being itself that accepts and gives the courage to be * * * It transcends both mysticism and personal encounter * * *" Courage to Be, 184–186 (1952).

"I have written of the God above the God of theism * * * In such a state (of absolute faith) the God of both religious and theological language disappears. But something remains, namely, the seriousness of that doubt in which meaning within meaninglessness is affirmed. The source of this affirmation of meaning within meaninglessness, of certitude within doubt, is not the God of traditional theism, but the 'God above God,' the power of being, which works through those who have no name for it, not even the name God." 2 Systematic Theology 12 (1957).

Again, in a passage adopted by the Bishop of Woolwich as the cornerstone of his own belief in God, Tillich says:

"The wisdom of all ages and of all continents speaks about the road to our depth * * * All those who have been concerned * * * with that road * * * have witnessed the same experience. They have found they were not what they believed themselves to be, even after a deeper level had appeared to them * * * The name of this infinite and inexhaustible depth and ground of all being is God. That depth is what the word God means. And if that word has not much meaning for you, translate it, and speak of the depths of your life, of the source of your being, of your ultimate concern, of what you take seriously without any reservation. Perhaps, in order to do so, you must forget everything traditional you have learned of God, perhaps even that word itself. For if you know that God means depth, you know much about him * * * He who knows about depth knows about God." The Shaking of the Foundations (The Depth of Existence), 56–57 (1948).

6. Jakobson comes closer to a traditional reading of "Supreme Being" than Tillich in one respect, namely, his acceptance of the notion of an original creator and supreme existence, which Tillich finds unacceptable as subjecting God to categories of finitude.

illegal. However, the Supreme Court cited with approval United States ex rel. Levy v. Cain, 149 F.2d 338 (2 Cir. 1945), where this Court granted a writ of *habeas corpus* because a special advisory panel had made a general conclusory recommendation that may have rested on grounds beyond its power and there was no proof that the Board had ignored it. And in United States v. Erikson, 149 F. Supp. 576, 579 (S.D.N.Y.1957), Judge Kaufman acquitted a defendant where although "the Appeal Board could validly have rested its decision on the hearing examiner's impression that the defendant was insincere, there was no evidence that the Board based its decision on this ground rather than the invalid ground." See also Shepherd v. United States, 217 F.2d 942 (9 Cir. 1954), rehearing den., 220 F.2d 855 (1955); and Ypparila v. United States, 219 F.2d 465 (10 Cir. 1954). We do not read Sovich v. Esperdy, 319 F.2d 21 (2 Cir. 1963), cited by the Government, as deciding anything to the contrary since in that case the Regional Commissioner expressly concurred in the erroneously reasoned opinion of the Special Inquiry Officer.

Since Jakobson's classification may have rested on an erroneous ground, his conviction cannot stand. We see no principle that would prevent our reversing for a new trial in which, if the Government chose, it could endeavor to prove from the mouths of members of the Appeal Board that they considered Jakobson to have been insincere. See United States v. Balogh, 157 F.2d 939, 944 (2 Cir. 1946), judgment vacated on other grounds, 329 U.S. 692 (1947); United States ex rel. Reel v. Badt, supra, 141 F. 2d 845 (2 Cir. 1944). But because we are dealing here with action taken by the Appeal Board five years ago, we think it more "just under the circumstances," 28 U.S.C. § 2106, to direct dismissal of the indictment, as was done in Batelaan v. United States, 217 F.2d 946, 947 n. 1 (9 Cir. 1954); Shepherd v. United States, supra, 217 F.2d 942; Ypparila v. United States, supra, 219 F.2d 465; and United States v. Erikson, supra, 149 F.Supp. 576,

without prejudice to such new proceedings for Jakobson's induction, if any, as the Selective Service System may think it wise to undertake.

Reversed.