UNITED STATES of America, Appellee,

v.

Daniel Andrew SEEGER, Defendant-Appellant.

No. 206, Docket 28346.

United States Court of Appeals Second Circuit.

Argued Nov. 15, 1963.

Decided Jan. 20, 1964.

Ezra H. Friedman, Asst. U. S. Atty. for Southern Dist. of New York, New York City (Robert M. Morgenthau, U. S. Atty., and Andrew T. McEvoy, Jr., and Robert J. Geniesse, Asst. U. S. Attys., on the brief), for appellee.

Kenneth W. Greenawalt, New York City (Lawrence P. J. Bonaguidi and Davies, Hardy & Schenck, New York City, on the brief), for defendant-appellant.

Before LUMBARD, Chief Judge, and KAUFMAN and HAYS, Circuit Judges.

KAUFMAN, Circuit Judge:

On this appeal, Daniel Andrew Seeger contends that he was improperly denied an exemption from military service because his conscientious objections were not dependent upon "a belief in a relation to a Supreme Being" as required by § 6 (j) of the Universal Military Training and Service Act, 50 U.S.C.App. § 456(j).

Seeger was convicted of violating 50 U. S.C.App. § 462, because of his refusal to submit to induction, as ordered by his local Selective Service Board. At his trial before Judge Levet without a jury, he stipulated that he received an induction notice and that he refused to comply with its terms.

The statute in question, as revised in 1948, provides that the Selective Service Act shall not "be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. Religious training and belief in this connection means an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, or philosophical views or a merely personal moral code." 50 U.S.C.App. § 456 (j). In filling out the form for those who claim conscientious objector status, Seeger found himself unable to assert categorically that he believed in a Supreme Being.

Although the government has conceded that Seeger's abhorrence of war is both sincere and predicated on "religious training and belief," as the phrase had been defined by this Court prior to the addition of the "Supreme Being" clause to the statute, United States v. Kauten, 133 F.2d 703 (2d Cir. 1943), appellant's draft board denied the exemption on the basis of its finding that Seeger's views were not grounded upon a "belief in a relation to a Supreme Being." Seeger asserts that the "Supreme Being" requirement, as applied to him, constitutes a law respecting an establishment of religion, within the meaning of the First Amendment, and an arbitrary classification, violative of the due process clause of the Fifth Amendment.

I.

As required by law, Seeger registered with his local draft board upon attaining his eighteenth birthday in September of 1953. Apparently, his pacifist sym-

pathies had not yet become fully developed, for in filling out his classification questionnaire, he ignored the claim for conscientious objector exemption, and simply indicated that he believed himself entitled to a student deferment. Initially classified 1-A, Seeger subsequently received the 2-S deferment and remained in that classification until August, 1958, when he was once again reclassified as 1-A.

On July 12, 1957, Seeger wrote to his local board, and for the first time revealed the conscientious objections to military service which were to lead to his refusal to submit to induction, and ultimately, to his conviction. In this letter, and in the forms and statements which soon followed, he sought to put into words the deeply-rooted beliefs and sentiments which formed the basis of his claim for an exemption.

The initial letter was itself not lengthy. "As a result of the resolution of a number of problems of conscience with which I have been preoccupied for the past months," Seeger wrote, "I am bound to declare myself unwilling to participate in any violent military conflict, or in activities made in preparation for such an undertaking. My decision arises from what I believe to be considerations of validity from the standpoint of the welfare of humanity and the preservation of the democratic values which we in the United States are struggling to maintain. I have concluded that war, from the practical standpoint, is futile and self-defeating, and that from the more important moral standpoint, it is unethical."

The nature and foundation of Seeger's objections were further illuminated in his response to the special form for conscientious objectors, prepared by the Selective Service System and forwarded to appellant by his local board. Although executing the claim for exemption from both combatant and non-combatant training and service, he significantly altered the wording of the printed form. Had he adopted the printed statement verbatim, Seeger would have declared that he was, "by reason of my religious training and belief, conscientiously opposed to participation in war in any form * * * *" Seeger was willing to endorse this oath as his own, but only after placing quotation marks around the word "religious," and deleting the words "training and."

His reply to the first question on the form, which inquired into his belief in a Supreme Being, was ultimately to prove fatal to Seeger's claim. Refusing to assert a simple belief or disbelief in a deity, Seeger felt compelled to express his convictions in more extensive terms. In a statement attached to the questionnaire, he explained his feeling that "the existence of God cannot be proven or disproven, and the essence of His nature cannot be determined. I prefer to admit this, and leave the question open rather than answer 'yes' or 'no.'" Seeger was anxious to explain, however, that "skepticism or disbelief in the existence of God does not necessarily mean lack of faith in anything whatsoever * * * Such personages as Plato, Aristotle and Spinoza evolved comprehensive ethical systems of intellectual and moral integrity without belief in God, except in the remotest sense." Finally, rejecting dependence upon his Creator for a guide to morality, Seeger asserted "more respect for * * * belief in and devotion to goodness and virtue for their own sakes, and a religious faith in a purely ethical creed."

With obvious sincerity, Seeger articulately attempted further to expound the ethical position to which he felt driven by his conscience. "It is our moral responsibility," he wrote, "to search for a way to maintain the recognition of the dignity and worth of the individual, the faith in reason, freedom, and individuality, and the opportunity to improve life for which democracy stands." In language which underscored the ethical foundation of his faith, he decried "the tremendous spiritual price that man pays for his willingness to resort to the mass destruction of human life to perpetrate his 'ideals.'" "I cannot," Seeger insist-

ed, "participate in actions which betray the cause of freedom and humanity. Experience with the past indicates that our armament policy will lead to war, and war, with its indiscriminate crushing of human personality, cannot preserve moral values * * * To resort to immoral means is not to preserve or vindicate moral values, but only to become collaborators in destroying all moral life among men."

Unmoved by his appeal, the selective service board voted to retain Seeger's 1-A classification, and ordered him to report for a pre-induction physical examination. When a personal appearance before the board failed to produce a different result, Seeger sought review by an Appeal Board which, in routine fashion, forwarded his file to the Department of Justice for an advisory opinion. The Department, in turn, requested the Federal Bureau of Investigation, as it does in all such cases, to investigate the accuracy and sincerity of Seeger's claims. And, as a result of this investigation, a highly favorable portrait of the appellant began to develop.

Seeger, it was revealed, was the son of an "exceptionally religious" Roman Catholic family, and two of his uncles had become priests. An honor student in high school, Seeger's academic record in college was outstanding, and he had been selected as editor-in-chief of his college newspaper. Friends, teachers and employers interviewed by the Bureau spoke highly of his personal qualities, with particular emphasis being placed on Seeger's unquestioned integrity and sincerity. It was noted, finally, that Seeger had no record whatsoever of legal or economic difficulties.

A résumé of this investigation was forwarded to a Hearing Officer of the Department of Justice, and a hearing was conducted in which two witnesses joined Seeger to appear in his behalf. As summarized in the report of the Justice Department, introduced into evidence below, the Hearing Officer reported that Seeger "impressed him as a truthful, decent young citizen who conscientiously objects to joining in any manner any activity which would bear on military affairs." Emphasizing Seeger's "extreme intelligence and lucidity," the Officer concluded "that the registrant is completely sincere in making his claim and that the character of registrant's beliefs, as adduced at the hearing and from the various documents on file, are honest." As further summarized by the Justice Department, the Officer added that Seeger "is opposed to participation in war in any form; that his conscientious objections are based upon his individual training and belief, both of which include research in religious and cultural fields; [and] that the registrant is sincere in his claim which is made in good faith." The Hearing Officer concluded by recommending that "the appeal of the registrant based upon grounds of conscientious objection be sustained."

Despite this recommendation and the results of the FBI investigation, the Justice Department advised against allowing Seeger an exemption. It is immediately apparent from a reading of the Department's report that its decision rested entirely on the finding that Seeger's objections, however sincere, were not based upon a "belief in a relation to a Supreme Being," as required by § 6(j) of the Act. Presumably for the same reason, the Appeal Board voted unanimously to retain Seeger's 1-A classification. The Presidential Appeal Board affirmed, and Seeger was ordered to report for induction. Reporting as directed, and having been found acceptable for military service, Seeger refused to submit to induction and the present prosecution and conviction ensued.[1]

---

1. Reporting, having been found acceptable, and taking all required steps short of the final submission to induction, Seeger is able here to challenge constitutional infirmities in the "jurisdiction" of the Board which denied him the exemption. Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946). Compare Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305 (1944).

## II.

The legislative background which underlies our present draft laws and their exemption for conscientious objectors has been thoroughly and recently explored by this court in United States v. Jakobson, 325 F.2d 409 (2d Cir. 1963). See also Conklin, Conscientious Objector Provisions: A View in the Light of Torcaso v. Watkins, 51 Geo.L.J. 252 (1963). It would be in order, however, to review that background in brief résumé. The Draft Act of 1917, 40 Stat. 78, afforded a statutory exemption only to those objectors affiliated with a "well-recognized religious sect or organization at present organized and existing and whose existing creed or principles forbid its members to participate in war in any form * * * " During the height of World War I, the constitutionality of this narrow provision was tersely upheld against First Amendment challenges, despite its limitation to specific, organized and historic pacifist churches. Selective Draft Law Cases, Arver v. United States, 245 U.S. 366, 389–390, 38 S.Ct. 159, 62 L.Ed. 349 (1918). But see Kurland, Religion and the Law 37–38 (1962).

The conscientious objector provisions of the 1940 selective service act were far more broadly drafted. In this statute, in effect throughout the Second World War, an exemption from combatant training was afforded to any person "who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form." 54 Stat. 889. Called upon to illuminate the congressional reference to "religion," Augustus Hand, writing for this court in United States v. Kauten, 133 F.2d 703 (2d Cir. 1943) offered an often-cited definition: "Religious belief arises from a sense of the inadequacy of reason as a means of relating the individual to his fellow-men and to his universe—a sense common to men in the most primitive and in the most highly civilized societies. It accepts the aid of logic but refuses to be limited by it. It is a belief finding expression in a conscience which categorically requires the believer to disregard elementary self-interest and to accept martyrdom in preference to transgressing its tenets. * * * Recognition of this obligation moved the Greek poet Menander to write almost twenty-four hundred years ago: 'Conscience is a God to all mortals'; impelled Socrates to obey the voice of his 'Daimon' and led Wordsworth to characterize 'Duty' as the 'Stern Daughter of the Voice of God.'"

"There is a distinction," the Court continued, "between a course of reasoning resulting in a conviction that a particular war is inexpedient or disastrous and a conscientious objection to participation in any war under any circumstances. The latter, and not the former, may be the basis of exemption under the Act. The former is usually a political objection, while the latter, we think, may justly be regarded as a response of the individual to an inward mentor, call it conscience or God, that is for many persons at the present time the equivalent of what has always been thought a religious impulse." 133 F.2d at 708.

Yet, while this expanded concept of religious belief was adopted in this circuit, United States ex rel. Phillips v. Downer, 135 F.2d 521 (2d Cir. 1943); United States ex rel. Reel v. Badt, 141 F.2d 845 (2d Cir. 1944), and was recognized as a constitutionally required definition of religion, West Virginia State Board of Education v. Barnette, 319 U.S. 624, 658, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (dissenting opinion of Frankfurter, J.), it was rejected in favor of a narrower standard by the Court of Appeals for the Ninth Circuit in Berman v. United States, 156 F.2d 377, cert. denied, 329 U.S. 795, 67 S.Ct. 480, 91 L.Ed. 680 (1946). Over the vigorous dissent of Judge Denman, the Berman court held that a belief which was not dependent upon faith in a Deity or superhuman power was in no sense religious, as Congress used the term. In revising the conscientious objector provision for the Selective Service Act of 1948, Congress expressly approved the Berman definition, and specifically

required a "belief in a relation to a Supreme Being" as a pre-requisite for exemption.

### III.

The exemption, as revised in 1948 by the addition of the "Supreme Being" definition of religion, has been upheld against constitutional challenges by the courts of this and other circuits on several occasions since its enactment. United States v. Bendik, 220 F.2d 249 (2d Cir. 1955);[2] Clark v. United States, 236 F.2d 13 (9th Cir. 1956), cert. denied, 352 U.S. 882, 77 S.Ct. 101, 1 L.Ed.2d 80 (1956); George v. United States, 196 F. 2d 445 (9th Cir. 1952), cert. denied, 344 U.S. 843, 73 S.Ct. 58, 97 L.Ed. 656. Most recently, the Court of Appeals for the Ninth Circuit, in a brief, three-paragraph opinion, refused to reconsider its holdings in the Clark and George cases, and adhered to its position that the Supreme Being requirement was a permissible legislative classification. Etcheverry v. United States, 320 F.2d 873 (9th Cir. 1963), cert. denied, U. S., 84 S.Ct. 331 (1963). Like the trial judge below, Bendik, Clark and George held that the exemption for conscientious objectors was an act of legislative grace, and could hence be granted upon any condition which Congress desired to impose. We find it unnecessary to determine whether an exemption for some or all conscientious objectors is a constitutional necessity, or is merely dependent upon the will of Congress. See Selective Draft Law Cases, Arver v. United States, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349 (1918); Hamilton v. Regents, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343 (1934). Compare School District of Abington Township, Pa. v. Schempp, 374 U.S. 203, 250–253, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (concurring opinion of Brennan, J.). For it now seems well-established that legislative power to deny a particular privilege altogether does not imply an equivalent power to grant such a privilege on unconstitutional conditions. See Speiser v. Randall, 357 U.S. 513, 78 S. Ct. 1332, 2 L.Ed.2d 1460 (1958). It could hardly be argued, for example, that the ability of Congress to deny an exemption to all conscientious objectors would permit Congress to limit that exemption to objectors of one particular religious denomination. We are thus compelled to determine the constitutionality of the particular limitation involved, and to consider whether the requirement of a belief in a Supreme Being could be validly employed to reject Seeger's claim to an exemption under existing constitutional doctrines.

### IV.

In Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1946), the Supreme Court offered what has perhaps become the most frequently quoted exposition of the significance of the "establishment clause." In the words of the Court, "[t]he 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. * * * In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between church and State.'"

But if the Supreme Court has been steadfast in its insistence that govern-

---

2. In no real sense may our decision today be said to "overrule" Bendik. From a reading of the Bendik opinion, it is clear that the court did not consider the argument that the Supreme Being requirement distinguished *among* religious beliefs, the question we decide today. Bendik, rather, was concerned with the permissibility of a distinction between religious and nonreligious objectors. For this reason, as well as the fact that the grounds upon which Bendik relied were placed in serious question by Speiser v. Randall, infra, Bendik neither conflicts with nor can be dispositive of the present appeal.

ment refrain from "aiding" one religion or all religions, School District of Abington Township, Pa. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); People of State of Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S. Ct. 461, 92 L.Ed. 649 (1948), it has been equally vigilant in rejecting any reading of the First Amendment which might dictate a policy of governmental hostility to religion or religious beliefs. Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952); Everson v. Board of Education, supra. The Constitution "requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary." Everson v. Board of Education, 330 U.S. at 18, 67 S.Ct. at 513, 91 L.Ed. 711. Indeed, one member of the Court has recently cautioned against a rigid interpretation of the establishment clause for fear of treading upon the individual citizen's right to the free exercise of his religion, a privilege equally basic to the First Amendment. School District of Abington Township, Pa. v. Schempp, 374 U.S. at 247, 83 S.Ct. at 1584–1585, 10 L.Ed.2d 844 (concurring opinion of Brennan, J.). And the "free exercise" clause has been interpreted so as to require government to afford private citizens the utmost freedom to remain true to their religious faith, and to observe the practices sacred to their religion, except when such conduct would impinge upon the equal rights of others, or would interfere with an overriding social objective. See Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); cf. Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961).

Although stopping short of an argument that the First Amendment compels an exemption for those whose religions prohibit participation in war, the government invokes just such a view of the "free exercise" clause to support the legislative classification challenged in the present case. In essence, the government appears to argue that the spirit of the "free exercise" clause is satisfied when religious objectors are permitted to avoid a course of conduct which their religion condemns. Stated in other words, the government's argument is that Congress was merely seeking to give the greatest possible latitude to the free exercise of religion when it enacted the conscientious objector provisions; since the Constitution does not require that a similar freedom be afforded the exercise of non-religious beliefs, it is reasonable to distinguish between them.

It is, of course, vital to such a line of reasoning that "religion" and "religious" be properly defined. "A statute could scarcely be defended * * * if it protected the 'free exercise' of only a few favored religions or preferred some religions over others without reasonable basis for doing so." United States v. Jakobson, 325 F.2d 409 (2d Cir. 1963). In this regard, the government attempts to justify the "Supreme Being" definition by asserting the propriety of a distinction between beliefs which are solely the result of individual reflection and those which the believer assumes to be the product of divine commands. Congress would be justified, or so it is argued, in refusing to defer to those individuals who merely invoke their own fallible judgment in opposition to that of the legislature; it would be less so with respect to those whose refusal to serve is based upon obedience to a power higher than that exercised by a mortal Congress.

 But while we find this argument persuasive, we are unable to consider it dispositive of the case before us. For we feel compelled to recognize that a requirement of belief in a Supreme Being, no matter how broadly defined, cannot embrace all those faiths which can validly claim to be called "religious." Thus it has been noted that, among other well-established religious sects, Buddhism, Taoism, Ethical Culture and Secular Humanism do not teach a belief in the existence of a Supreme Being. Torcaso v. Watkins, 367 U.S. 488, 495 n. 11, 81 S.Ct.

1680, 6 L.Ed.2d 982 (1961). Indeed, our country has long prided itself on the enormous diversity of religious beliefs which have been able to find acceptance and toleration on these shores. In this regard, Mr. Justice Brennan has recently explained the development of judicial attitudes towards the First Amendment, by observing that "our religious composition makes us a vastly more diverse people than were our forefathers. They knew differences chiefly among Protestant sects. Today the Nation is far more heterogeneous religiously, including as it does substantial minorities not only of Catholics and Jews but as well of those who worship according to no version of the Bible and those who worship no God at all." School District of Abington Township, Pa., v. Schempp, 374 U.S. 203, 240, 83 S.Ct. 1560, 1581, 10 L.Ed.2d 844 (1963) (concurring opinion). In the face of this vast conglomeration of differing ideas and ideals, it is not surprising that no single concept may be found which is common to all.

In Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961), the Supreme Court struck down as invalid a state statute requiring notaries public to affirm their belief in the existence of God. Although referring to the evils historically attendant upon the requirement of a religious oath for public office, the Court was careful to place its decision on far broader grounds. Government could not, the Torcaso court declared, place the power and authority of the state "on the side of one particular sort of believers— those who are willing to say that they believe in 'the existence of God.'" Belief in a Deity was, for the Court, "a belief in some particular kind of religious concept." And the requirement that candidates for office affirm their devotion to such a concept was, the court held, beyond the constitutional powers of the state.

In a very real sense, our decision in Kauten was the precursor of Torcaso.

For in Kauten's broad definition was embraced the recognition that "religion" could not be confined to a belief in a supernatural power; that today, a pervading commitment to a moral ideal is for many the equivalent of what was historically considered the response to divine commands. The Kauten test represents an acknowledgment that for many in today's "skeptical generation," just as for Daniel Seeger, the stern and moral voice of conscience occupies that hallowed place in the hearts and minds of men which was traditionally reserved for the commandments of God. It is in this respect that Kauten has found its way into the pages of the United States Reports, generally accompanied by a recognition of the impropriety inherent in a governmental determination of what is a "true" or "acceptable" religious belief. See Saia v. People of State of New York, 334 U.S. 558, 564, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948) (dissenting opinion of Frankfurter, J.); West Virginia State Board of Education v. Barnette, supra, 319 U.S. at 659, 63 S.Ct. at 1195, 87 L. Ed. 1628. Cf. United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944).

And if a distinction between internally derived and externally compelled beliefs raises serious theoretical problems, the practical difficulties which it engenders are no less perplexing. When Daniel Andrew Seeger insists that he is obeying the dictates of his conscience or the imperatives of an absolute morality, it would seem impossible to say with assurance that he is not bowing to "external commands" in virtually the same sense as is the objector who defers to the will of a supernatural power. Indeed, we would create an impossible task for draft boards and courts alike were we to insist upon a distinction between Arno Sascha Jakobson's devotion to a mystical force of "Godness" and Daniel Andrew Seeger's compulsion to follow the paths of "goodness." [3]

3. The government has argued that the "Supreme Being" standard may be justified as simplifying the task of the draft boards by providing an objective standard for the determination of sincerity and religious belief. In light of Jakobson's ex-

■ It is to be emphasized once again that there is no question in this case, as there was in Jakobson, as to the sincerity of Seeger's beliefs or the tenacity with which they are held. With commendable candor, the government has fully conceded that Seeger's views fall squarely within the definition of "religion" announced for this Circuit in Kauten, and subsequently reaffirmed in Phillips and Reel. While we are, therefore, most reluctant to find that Congress, in a sincere attempt to balance the personal rights of a minority with the insistent demands of our national security, has transgressed the limits imposed by the Constitution, we are compelled so to hold. This is not to deprecate the enormity of the congressional burden; we fully appreciate the duty and powers of Congress to ensure peace and stability in these unstable times by recruiting citizens for the armed forces. We further recognize the concern for personal liberties and religious freedom which led to the enactment of the conscientious objector exemption in the face of the perils which confront us throughout the world. At the same time, however, we cannot conclude that specific religious concepts, even if shared by the overwhelming majority of the country's organized religions, may be selected so as to discriminate against the holders of equally sincere religious beliefs. Especially when considered in the light of Torcaso and the still more recent teachings of the Supreme Court, a line such as is drawn by the "Supreme Being" requirement between different forms of religious expression cannot be permitted to stand consistently with the due process clause of the Fifth Amendment. We are convinced that the believer in a Supreme Being is not for that reason alone more entitled to have his conscience respected by a draft board than is Daniel Seeger. In the words of Madison's historic Remonstrance, recently cited by the Supreme Court in Engel v. Vitale, 370 U.S. 421, 432, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1962), "religion is too personal, too sacred, too holy, to permit its 'unhallowed pervision' by a civil magistrate."

We wish to make clear, moreover, that by holding the "Supreme Being" requirement to create an impermissible classification under the circumstances present here, we are not passing upon the validity of legislative classifications in terms of religion in any other context.[4] As an observer has recently noted, "to characterize constitutional limitations as inflexible imperatives is an unproductive form of judicial activity." Pollak, Forward: Public Prayers in Public Schools, The Supreme Court—1962 Term, 77 Harv.L. Rev. 62, 67 (1963). We feel it the soundest course to deal with such problems as they are presented to us, and not to lay down hard and fast rules which may be inappropriate to some of the many and varied interactions between government and religion.

In Zorach v. Clauson, 343 U.S. 306, 313, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952), the Supreme Court acknowledged that "[w]e are a religious people whose institutions presuppose a Supreme Being." Our disposition of this appeal is in keeping with this declaration. It has often been noted that the principal distinction between the free world and the

panded definition of "Supreme Being," the test would hardly be free from complexities. In any event, "government may not employ religious means to serve secular interests, however legitimate they may be, at least without the clearest demonstration that nonreligions means will not suffice.". School District of Abington Township, Pa. v. Schempp, 374 U.S. 203, 265, 83 S.Ct. 1560, 1594, 10 L.Ed.2d 844 (1963) (concurring opinion of Brennan, J.).

4. It is not inappropriate to note, however, that two courts recently confronted with statutes providing tax exemptions for "religious" organizations interpreted "religion" so as to include groups possessing no theistic beliefs, expressly to avoid constitutional difficulties. Fellowship of Humanity v. County of Alameda, 153 Cal. App.2d 673, 315 P.2d 394 (1957); Washington Ethical Society v. District of Columbia, 101 U.S.App.D.C. 371, 249 F. 2d 127 (1957). See also 58 Colum.L.Rev. 417 (1958).

Marxist nations is traceable to democracy's concern for the rights of the individual citizen, as opposed to the collective mass of society. And this dedication to the freedom of the individual, of which our Bill of Rights is the most eloquent expression, is in large measure the result of the nation's religious heritage. Indeed, we here respect the right of Daniel Seeger to believe what he will largely *because* of the conviction that every individual is a child of God; and that Man, created in the image of his Maker, is endowed for that reason with human dignity.

Judgment reversed.