457 F.2d 621
 UNITED STATES of America ex rel. Donald Samuel ZELMAN,
Petitioner-Appellee,
v.
Glen D. CARPENTER, Maj. United States Army, Commander, Armed
Forces Examining and Entrance Station, and the
Secretary of the Army, Respondents-Appellants.
 No. 86, Docket 35672.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 30, 1971.
Decided March 27, 1972.
 
 Joel L. Daniels, Buffalo, N. Y., for petitioner-appellee.
 Norman E. S. Greene, Asst. U. S. Atty. (H. Kenneth Schroeder, Jr., U. S. Atty., for Western District of New York, on the brief), for respondents-appellants.
 Before LUMBARD, WATERMAN and FEINBERG, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 Donald Zelman was classified I-A by his local draft board and issued a notice of induction. After exhausting his administrative appeals, he sought a writ of habeas corpus which was granted in Western District of New York on the ground that the draft board had had no basis in fact for issuing the I-A classification. The United States has appealed. We reverse.
 
 
 2
 Judicial review of a draft board's classification of a registrant has always been restricted to determining whether the board had a "basis in fact" for its determination. Estep v. United States, 327 U.S. 114, 122-123, 66 S.Ct. 423, 90 L.Ed. 567 (1946); 50 U.S.C.App. Sec. 460(b) (3). Review of this nature only seeks to ensure that the board has not acted arbitrarily; the reviewing court may not substitute its judgment for that of the board and review is limited to those facts actually presented to the board.[1] Cox v. United States, 332 U.S. 442, 68 S.Ct. 115, 92 L.Ed. 59 (1947); Helwick v. Laird, 438 F.2d 959, 965-966 (5th Cir. 1971); Keefer v. United States, 313 F.2d 773, 776 (9th Cir. 1963); United States v. Ruppell, 278 F.Supp. 287, 289-290 (E.D.N.Y.1968); see Silberberg v. Willis, 420 F.2d 662, 665 (1st Cir. 1970); Bates v. Commander, 413 F.2d 475, 477 n. 2 (1st Cir. 1969). Applying these principles to the evidence before the board at the time the board reclassified Zelman, we find that the board did have a basis in fact for classifying Zelman I-A in September 1969. Accordingly, we reverse the order of the district court.
 
 
 3
 In September 1968, Zelman, who had recently been classified I-A by the local draft board, requested that his classification be changed to III-A on the ground that his induction into the armed forces would cause his mother extreme hardship. 32 C.F.R. 1622.30. Zelman filed a dependency questionnaire which indicated that his mother's annual income was $1,200 and that he contributed $875 annually to her support. He further stated that his mother's house had been recently sold, but the sale price was not revealed.[2]
 
 
 4
 On November 7, 1968, Zelman appeared before the board with his mother. Zelman told the board that his father had died in January 1967 and he was his mother's sole support, although he had recently been fired from his job. He had an older brother in the armed forces, but his brother had a wife and child and could not help support his mother. Mrs. Zelman stated that she had been under a strain since her husband had died and did not work. She received $103 per month from Social Security.
 
 
 5
 Based on this information, the board granted Zelman a III-A classification until February 1969.
 
 
 6
 On January 26, 1969, Zelman filed another dependency questionnaire with the board. He indicated that his mother had an approximate annual income of $100 (obviously an error) and that he contributed approximately $1100 annually to her support. In the space on the form for a statement by the dependent, Mrs. Zelman wrote that her income was now "$115 a month" or $1380 per year.
 
 
 7
 Zelman appeared before the local board on March 13, 1969. The board inquired whether there had been any changes in his status since his last appearance before the board and Zelman said that his brother had been released from the armed forces. Zelman's III-A classification was then continued for six months.
 
 
 8
 On July 30, 1969, Zelman filed a dependency questionnaire which indicated that his mother's annual income was $1100 and that he contributed $1300 annually to her support.
 
 
 9
 On September 4, 1969, Zelman again appeared before the board. In response to the board's inquiry about changes in circumstances, Zelman replied that he had a new job and that his mother was working, but that "she is not going to stay because she is not able to keep up with it."
 
 
 10
 Based on the information in the latest dependency questionnaire and the other information before it, the local board classified Zelman I-A.
 
 
 11
 Zelman then requested a personal appearance before the local board pursuant to 32 C.F.R. 1624.1 to present new information to the board that might warrant the reopening of the I-A classification. On November 6, 1969, he appeared before the local board and told the board that he was now earning $170 per week and that his mother was no longer working. The board refused to reopen the classification. Zelman then appealed to the Western District Appeal Board for New York and, on January 14, 1970, the appeal board by a 4-0 vote affirmed the I-A classification.
 
 
 12
 On February 17, 1970, Zelman was mailed a notice of induction which required him to report for induction on March 18, 1970. Zelman then sought a writ of habeas corpus alleging that the local board had had no basis in fact for classifying him I-A in September.
 
 
 13
 The district court, finding that there had been no change in the Zelmans' circumstances from the time that Zelman first was classified III-A to the time he was classified I-A, granted the writ. The court held that 32 C.F.R. 1625.2(b) required that such a change must have occurred before a local board could validly reclassify him.
 
 
 14
 We agree that no draft classification can be reopened on the local board's own motion unless the "action is based upon facts not considered when the registrant was classified which, if true, would justify a change in the registrant's classification." 32 C.F.R. 1625.2(b). However, on this record, it appears that such a change had occurred.
 
 
 15
 When Zelman received his III-A classification in November 1968, he was contributing less than half of his mother's support. Similarly, when the draft board continued his III-A classification in March 1969, he was still contributing less than half of his mother's annual income. However, by September 1969, Zelman himself informed the draft board that he was contributing more than one-half of his mother's support, i. e., $1300 out of an approximate total income of $2500.
 
 
 16
 A member of the armed forces who is supplying more than one-half of a dependent's income prior to entry into the service is entitled to an armed forces Class Q allotment which provides $100 per month to the dependent. Based on the information supplied to it by Zelman and his mother, the first time the draft board could have found Zelman eligible for a Class Q allotment was in September 1969.
 
 
 17
 At that time, Zelman was supplying approximately $108 per month to his mother. The Class Q allotment would have provided her with $100 per month and, obviously, his induction into the armed forces would not have caused a change in her financial circumstances. If a registrant's departure from civilian life will not affect his family's financial status, his induction hardly constitutes extreme hardship.[3]
 
 
 18
 It is true that the local board did not expressly rely upon the availability of a Class Q allotment to support its decision. But local boards then were not required to give written reasons for their determinations. It sufficed that there was some evidence before the board to justify its conclusions. As we have only recently held in Weissman v. Officer of Day, 444 F.2d 1326, 1328 (2d Cir. 1971), "When a local board fails to identify the ground upon which it based its decision to deny the requested classification . . . our only inquiry is whether all the grounds upon which the board might have relied were legally correct and whether each of them was supported by a basis in fact." The availability of the Class Q allotment gave the local board a basis in fact, Estep v. United States, 327 U.S. 114, 122-123, 66 S.Ct. 423, 90 L.Ed. 567 (1946), for changing Zelman's classification from III-A to I-A. The order of the district court granting the writ of habeas must be reversed.
 
 FEINBERG, Circuit Judge (dissenting):
 
 19
 I emphatically dissent from this reversal of an experienced district judge who is certainly more familiar than any of us with what constitutes "extreme hardship" for a widow in Buffalo. The basis of the reversal is an afterthought never mentioned by the local draft board and first dreamed up by a government attorney in searching for some way to convince the district judge that the board had not acted arbitrarily. But that is exactly how the board appears to have acted, first pressuring appellee Donald Samuel Zelman to join the Reserves or the National Guard and then, when he failed to do so, revoking his III-A classification upon no apparent basis after a five-minute meeting. To make matters worse, the majority opinion ignores precedent that would require at the very least a remand here rather than an outright reversal of the granting of the writ.
 
 
 20
 The question before the district court was whether the local board had a "basis in fact" for the change in Zelman's classification in September 1969 from III-A to I-A. Prior to that time, Zelman had twice been classified III-A, once in November 1968, and again in March 1969, on the ground that his "induction into the armed forces would result in extreme hardship" to his widowed mother, who was "dependent upon him for support." 32 C.F.R. Sec. 1622.30(a). At the time of the first III-A classification, Zelman's father had been dead for some 22 months; he had left a family residence, some insurance, and a modest savings account. Before the first classification, the house had been sold and Zelman had so informed the board. Although it is not precisely clear in the record, Zelman's mother was apparently thus left with a net amount of about $13,000 in savings. No one argues that either of the two earlier III-A classifications was erroneous or that Mrs. Zelman should have been required to "delve into her meager investment." Lewis v. Secretary, Dep't of Army, 402 F.2d 813, 820 (9th Cir. 1968). The question immediately arises, then, why did the board change Zelman's classification to I-A in September 1969?
 
 
 21
 The record does show rather clearly one possible "basis in fact" for the reclassification: appellee's failure to enlist in some unit of the armed forces. According to the minutes of the March 1969 meeting:
 
 
 22
 The local board asked the registrant about getting into the Reserves or the National Guard and he said that he's been trying to get into them.
 
 
 23
 At the September 1969 meeting, at which he was reclassified I-A, the board again asked "if he ever tried to get into the Reserves or the National Guard." Again, at the November 1969 meeting, the board asked "if he was going into the National Guard," and finally, at a March 1970 meeting, the board questioned, ambiguously, "Didn't [appellee] ever think that selective service would expect you to go into the service." Whether or not a citizen should seek alternative military service (with less active duty) if spending two years in the army would inflict an extreme hardship on his widowed mother, the board's concern about appellee's failure to enlist was wholly improper. As Chief Judge Henderson recognized, that failure could not provide "a legitimate basis" for reclassification, and the majority does not directly dispute that proposition.[1]
 
 
 24
 So the question still remains: Was there a proper reason for changing Zelman's classification from III-A to I-A? The majority agrees with Chief Judge Henderson that the local board could not reclassify appellee on its own motion unless its action was "based upon facts not considered when the registrant was classified which, if true, would justify a change in the registrant's classification." 32 C.F.R. Sec. 1625.2(b). The wording of that regulation certainly suggests that the "facts" relied upon in court to justify a local board's action should be "facts" of which the board was aware. The majority speculates that the "basis in fact" for the change was "[t]he availability of the Class Q allotment" to support Zelman's mother.[2] But a reading of the record discloses not a word by the local board about the allotment in any of the five board meetings that appellee attended. Moreover, not only would the availability of a Class Q allotment not have been conclusive as a matter of law,[3] but also I doubt whether the sketchy and confusing record here on that issue would afford a "basis in fact" for the board's action.[4]
 
 
 25
 But even if we make the improbable assumption that the board really did focus on the Class Q allotment, affirmance of the board's decision is still inappropriate. Where, as here, a board has given no reason for its reclassification and a strong probability exists that the decision was based on an improper ground, I think that the decision cannot be sustained. See United States v. French, 429 F.2d 391 (9th Cir. 1970); United States v. Jakobson, 325 F.2d 409, 416-417 (2d Cir. 1963), aff'd sub nom. United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).[5] At the very least we should order a remand and give the Government an opportunity to supplement the record on the question of which basis the board actually relied upon. See United States v. Deere, 428 F.2d 1119 (2d Cir. 1970); United States v. Lenhard, 437 F.2d 936 (2d Cir. 1970). The majority cites Weissman v. Officer of the Day, 444 F.2d 1326 (2d Cir. 1971), in support of its position, but with all respect that case reinforces my view. The court there took great pains to point out that it was "not confronting a case . . . where the board may have relied on an illegitimate ground in refusing the classification." 444 F.2d at 1328. This is just such a case and falls squarely within even the language of Weissman quoted by the majority, since one of the grounds "upon which the board might have relied" was not "legally correct." In any event, the closest case is not Weissman, in which the registrant never did receive a III-A classification, but Lewis v. Secretary, Dep't of Army, supra, relied on by Chief Judge Henderson, which held a reclassification from III-A to I-A improper.
 
 
 26
 While a remand would, therefore, ordinarily be proper, I believe under the circumstances of this case an affirmance is more appropriate. Not only is the record inadequate,[6] but the very nature of a III-A classification calls for a continuing review of changing circumstances. Rather than having another hearing in court as to what draft board members were thinking of two and a half years ago, it seems wiser for the board to consider the dependency claim anew on the basis of the facts as they now exist. Cf. United States v. Jakobson, supra, 325 F.2d at 417. I realize that quite apart from any re-examination of the III-A claim, there may now be factors that could stand in the way of drafting appellee. But, for the reasons stated above, I would not regard that as a calamity.
 
 
 
 [1]
 The dissent suggests that the local board's classification of Zelman was invalid because the reasoning behind the decision to make the change is unknown. But until the most recent revision of the draft laws, P.L. 92-129, 40 USLW 1, 3 (Sept. 28, 1971), the draft board was not required to give any reasons for its decisions. The only inquiry for a court was whether the board had been palpably unlawful in its classification of a registrant and this was presumed not to be the case if the board had a basis in fact for its determination
 
 
 [2]
 At the hearing before Judge Henderson, Zelman testified that the house sold for $10,000
 
 
 [3]
 The dissent has argued that Zelman's refusal voluntarily to enter into any branch of the armed services triggered his reclassification from III-A to I-A. Cited in support of this speculation are the board's three inquiries over the space of a year as to whether Zelman had attempted to enter the Army Reserve or National Guard and his negative replies. The dissent believes that these questions evinced an unfair and vindictive attitude on the board's part. In the circumstances of this case, however, the opposite conclusion can equally well be drawn. We should not lose sight of the fact that the board twice granted Zelman a III-A classification, hardly an indication of any hostility. In asking Zelman whether he had joined the Reserves, the board may well have been attempting to establish how long Zelman would be carrying a III-A classification that they had come to feel he no longer deserved and at the same time to alert him to the fact that his classification was likely to be changed. Their conduct is quite consistent with an offer to let Zelman join the Reserves rather than be subject to the harsher burdens of the draft. We see no reason to suppose that this civilian agency run by voluntary workers would raise the question of the Army Reserve or the National Guard for vindictive purposes or that the action of the board was thereby tainted
 
 
 [1]
 The majority hypothesizes that the board may have made an "offer" to trade a temporary hardship deferment in return for appellee's promise to enlist in the reserves. The record discloses no such offer. If anything, since the board did not mention the reserves until its second meeting with appellee, we may well conclude that the initial III-A classification was based only upon consideration of relevant circumstances-circumstances which apparently did not change
 
 
 [2]
 Since the majority offers no other "basis in fact" for the reclassification, it is not necessary to discuss the Government's suggestion that changes in "family conditions" justified the reclassification, other than to note that Chief Judge Henderson was not so persuaded and that I would not overrule his determination
 
 
 [3]
 Thus, 32 C.F.R. Sec. 1622.30(d) provides:
 In the consideration of a dependency claim, any payments of allowances which are payable by the United States to the dependents of persons serving in the Armed Forces . . . shall be taken into consideration, but the fact that such payments of allowances are payable shall not be deemed conclusively to remove the grounds for deferment. . . . [Emphasis added.]
 
 
 [4]
 The majority places great reliance on appellee's statement in the Dependency Questionnaire dated July 30, 1969 that his mother's "Approximate Annual Income" was $1,100 and that he contributed an additional $1,300. The relatively small difference of $200 is crucial because the Class Q allotment is available only if the inductee contributes more than one-half of his dependent's total income. However, I doubt whether this single entry in the record can support the weight placed upon it. First, the questionnaires in this case-including the July Questionnaire-are fraught with obvious errors. Second, the July Questionnaire itself only requested "Approximate" figures. And third, at the critical September 1969 meeting, the board was informed that Mrs. Zelman had been working, yet apparently asked no questions about how much her earnings supplemented the crucial $1,100 figure. Indeed, the March 1970 meeting indicates that Mrs. Zelman's pension income was $1,200 annually, supplemented by perhaps several hundred dollars interest income on savings. The record is thus devoid of any indication that the board attempted to elicit complete data or that it determined the accuracy of the data supplied
 
 
 [5]
 I do not suggest, as the majority implies, 457 F.2d at 624, that the reclassification decision should not be sustained simply because the board did not set forth its reasons, a procedure that unfortunately did not violate the statute as then written. My point is rather the reverse, not the absence of specified reasons but the glaring presence in the record of an improper reason for the reclassification. It is the existence of that strong possibility that dictates a remand at the very least
 
 
 [6]
 See note 4 supra