**UNITED STATES of America,
Appellee,**

v.

**Stephen BORNEMANN, Appellant.**

**No. 282, Docket 33716.**

United States Court of Appeals
Second Circuit.

Argued Dec. 9, 1969.

Decided Jan. 5, 1970.

F. Mac Buckley, Asst. U. S. Atty., Hartford, Conn. (Stewart H. Jones, U. S. Atty., on the brief), for appellee.

Catherine G. Roraback, Canaan, Conn., for appellant.

Before MOORE and KAUFMAN, Circuit Judges, and RYAN,* District Judge.

IRVING R. KAUFMAN, Circuit Judge:

A Selective Service Appeal Board may base its denial of an application for conscientious objector status on one of two grounds: a determination that the substance of the applicant's beliefs does not qualify him for the statutory exemption or a conclusion that the applicant is not sincere in his beliefs. In this case, it is unquestioned that the beliefs of the appellant Stephen Bornemann, if sincerely held, would entitle him to classification as a conscientious objector. We must rule on the less tangible question of sincerity; specifically, we must decide whether an Appeal Board may properly draw an inference of insincerity from an applicant's presentation of his claim when it became relevant to his Selective Service classification, rather than when it matured.[1]

Stephen Bornemann registered with Local Board No. 20 in Torrington, Connecticut on November 24, 1962, his eighteenth birthday. At this time he was a freshman at Trinity College in Hartford, Connecticut and, although initially classified I–A (available for service), he was clearly entitled to a student deferment under current Selective Service policies. His board recognized this fact for, the following autumn, as soon as an official of the College notified the board that Bornemann was satisfactorily pursuing a course of instruction at Trin-

---

* Of the Southern District of New York, sitting by designation.

1. In addition to challenging the factual basis for the action of the Appeal Board, Bornemann directs a host of arguments against the constitutionality of the procedures employed by the Selective Service System in determining whether to grant applications for classification as a conscientious objector and of the limited scope of review available in the courts. After careful consideration, we have concluded that these contentions are without merit. United States v. Morico, 415 F.2d 138 (2d Cir. 1969).

ity, he was placed in classification II–S (student deferment).

Bornemann retained his student deferment without interruption until his graduation from college in June 1966. On the 23rd of that month, the board reclassified him I–A, following the practice it pursued with all who graduated. One month before his graduation, however, Bornemann had learned of his acceptance as a volunteer in VISTA (Volunteers In Service To America), an anti-poverty program established by the Economic Opportunity Act of 1964. On this ground he had requested an occupational deferment. He had good reason to believe that this request for a II–A classification would be favorably received. A VISTA information booklet, which became a part of Bornemann's Selective Service file, stated that VISTA volunteers usually received occupational deferments. Moreover, a Selective Service Statement distributed in June 1965 recognized that the "establishment and operation of VISTA is in the national interest" and concluded that "the classification of registrants in VISTA can be handled as any other registrant engaged in activities in the national health, safety, or interest." Bornemann's expectations were well founded. On July 7, 1966, less than ten days after he had received notice of his I–A classification, he was granted an occupational deferment by the unanimous vote of his local board.

Bornemann's experience with VISTA was brief and apparently unsatisfactory, for shortly after entering the training program he resigned. He informed his local board that he agreed with the goals of the program but could not accept the methods it employed to achieve them. Having been apprised of the resignation by both Bornemann and VISTA, the Board placed Bornemann in Class I–A on August 11, 1966.

Upon receiving notice of his reclassification, Bornemann requested that his board send him SSS Form No. 150 (Special Form for Conscientious Objector).

This request was the first indication given the Board that he was a conscientious objector. Bornemann completed the SSS 150 and returned it to his board on September 2, the due date stamped upon the front page of the form. The completed application showed a gradual and coherent evolution of Bornemann's conscientious objections to military service, convictions planted by his family background and early religious training and ripened by more recent religious experiences, readings in the literature of non-violence, and documented association with a number of pacifist groups during his years in college. Bornemann's father had been a conscientious objector during World War II, and his mother had been educated in a Quaker school. His entire family had a marked international bent; every member had participated, either as host or visitor, in the student exchange program sponsored by the American Field Service, an organization devoted to international peace and understanding. Bornemann had received his early religious training in the Congregational Church, and, although not a member of any particular sect, while in college he attended religious services of several different denominations. Among the means by which he had expressed his opposition to war while a student at Trinity College was by helping to sponsor a meeting of pacifist groups, including the American Friends Service and the Committee for Non-Violent Action.

At his personal appearance before his local board on October 13, 1966, Bornemann revealed that he had been conscientiously opposed to service in the armed forces since the age of eighteen. Asked why he had not requested classification as a conscientious objector at the time he first registered with the Selective Service System, he responded that he had not considered such a request necessary since, until August 1966, he had always been classified in either II–S or II–A. Following this personal appearance, the board unanimously denied his request for classification as a

conscientious objector, and Bornemann appealed from this denial.

In accordance with the procedures then in force, the Appeal Board made a preliminary determination that Bornemann should not be placed in classification I–O, then referred the appeal to the Department of Justice for investigation and report.[2] The Federal Bureau of Investigation proceeded to compile an extensive report on Bornemann's views, experiences, and associates during the period since his eighteenth birthday. Agents contacted high school teachers, neighbors, college officials, and college roommates. Of these individuals many who had not seen Bornemann recently were surprised to learn that he now claimed to be a conscientious objector, and several expressed disapproval of a change in his manner and appearance which they had discerned during the previous two years, but all were of the opinion that Stephen Bornemann was likely to be sincere in whatever position he expressed. On the basis of this report and the testimony of Bornemann, his father, his wife, and a clergyman at a hearing held on September 11, 1967, the Department of Justice hearing officer concluded that Bornemann was sincere and recommended that he be classified as a conscientious objector to all service in the armed forces.

However, T. Oscar Smith, the Chief of the Department's Conscientious Objector Section took issue with the conclusion of the hearing officer He based this disagreement on two factors. First, Smith noted an apparent inconsistency between a statement contained in Bornemann's application for conscientious objector status and a subsequent statement set forth in the local board's summary of his personal appearance.[3] Second, in Smith's view Bornemann's failure to present his constitutional objections to his local board prior to August 1966 evidenced a lack of sincerity. Consequently, on November 9, 1967 the Department of Justice concluded "that the registrant is not sincere in his conscientious-objector claim and [recommended to the Appeal Board] that the claim be not sustained and that he be not classified in Class I–O or in Class I–A–O." The Appeal Board accepted this recommendation and, the following February, voted unanimously to deny Bornemann conscientious objector status. Since Selective Service Boards are exempt from those provisions of the Administrative Procedure Act which require administrative agencies to make written findings, we cannot know whether the Appeal Board accepted the rationale proposed by the Department of Justice or acted for reasons of its own.

As a result of the Appeal Board's determination, Bornemann's induction into the armed forces was set by his local board for September 4, 1968. Prior to this date, however, he notified the board that his convictions would prevent him from submitting to induction. True to his word, he appeared at the induction center on the appointed day but refused to be inducted. He was indicted for this refusal, tried in the District of Connecticut before Judge Blumenfeld, sitting without a jury, convicted and sen-

2. Section 456(j) of 50 App.U.S.C. (1964) required that appeals from the denial of applications for conscientious objector status be referred to the Department of Justice. The Department's role was eliminated by the Selective Service Act of 1967, Pub.L.No. 90–40, § 1(7), 81 Stat. 100, 104, codified at 50 App.U.S.C. § 456(j) (Supp. IV, 1969).

3. In his original application for classification as a conscientious objector, Bornemann affirmed his belief in a Supreme Being. According to a summary of Bornemann's personal appearance before his local board · prepared by the local board, at that appearance he denied belief in a Supreme Being. The summary did not purport to be a transcript of the meeting. Furthermore, it seemed to have been carelessly prepared—several words were misspelled, and several sentences were ungrammatical. However, in enumerating the factors which might have provided a basis in fact for the Appeal Board's decision, the able district judge afforded no weight to this alleged "inconsistency."

tenced to an indefinite term under the Youth Corrections Act, 18 U.S.C. § 5010 (b).

We have been instructed that in a conscientious objector case where the ultimate question is the sincerity of the registrant, "objective facts are relevant only insofar as they help in determining the sincerity of the registrant in his claimed belief, purely a subjective question." Witmer v. United States, 348 U.S. 375, 381, 75 S.Ct. 392, 396, 99 L.Ed. 428 (1955). Because of the circumstances in this case, therefore, we are required to determine whether the Department of Justice improperly concluded that Bornemann's failure to bring his conscientious objections to military service to the attention of his local board prior to August 1966 was a relevant objective fact from which the Appeal Board could infer insincerity.

Section 465(b) of 50 App.U.S.C., the statute in force at all times during the period when Bornemann's classification was in question, provided that "[i]t shall be the duty of every registrant to keep his local board informed as to * * * changes in status as required by such rules and regulations as may be prescribed by the President." The applicable regulation, 32 C.F.R. § 1625.1(b), requires that "[e]ach classified registrant * * * shall, within 10 days after it occurs, report to the local board in writing any fact that might result in the registrant being placed in a different classification * * *." In order to determine which facts "might result in the registrant being placed in a different classification," it is necessary to examine 32 C.F.R. § 1623.2. This regulation specifies "that when grounds are established to place a registrant in one or more of the classes listed in the following table [which lists all classifications other than I–A (available for service)], the registrant shall be classified in the lowest class for which he is determined to be eligible." The table set forth in the regulation clearly indicates that classes II–S, student defer-

ment, and II–A, occupational deferment, both classifications held by Bornemann during his college and VISTA days, were lower than the I–A–O and I–O classifications afforded conscientious objectors. Since these two regulations are to be read *in pari materia*, we are compelled to conclude that the facts which "might result in the registrant being placed in a different classification" and which each registrant must therefore bring to the attention of his board promptly are those which could result in his being placed in a lower classification. Any other construction would mean that already busy boards would be required to receive, record, consider and file reams of immaterial information having no bearing on the classification then held by a registrant, an intention the drafters of the regulations could scarcely have entertained.

It is clear that at no time prior to August 1966 would Bornemann's presentation of his conscientious objector claims have resulted in his being placed in a classification lower than one he was entitled to on other grounds. From November 1962 when he registered with his local board, until October 1963, Bornemann was classified I–A, a class higher than either of the conscientious objector classifications. But throughout this period, he was unquestionably and concededly entitled to a student deferment. Moreover, he knew well that he would receive this deferment, as he did, as soon as his college got around to certifying his attendance, which it did the following September. He retained his II–S deferment until June 27, 1966, the date when his local board as a matter of routine upon graduation, mailed the notice of his I–A classification. Less than ten days after he received this notice, Bornemann was placed in classification II–A, because of his service in VISTA, which he entered upon graduation from Trinity. When he was again reclassified I–A in August 1966 as a result of his voluntary withdrawal from VISTA, he immediately presented his claims for conscientious objector status.

■ We are thus of the view that Bornemann brought his conscientious objections to the attention of his board as soon as 32 C.F.R. § 1625.1(b) required him to do so. In our view it would be improper to penalize him for failure to act with greater dispatch than the regulations demanded. We conclude therefore, when the Department of Justice maintained that Bornemann's failure to present his claims prior to August 1966 was an objective factor the Appeal Board could consider as tending to show insincerity, it erred.

■ Our conclusion is in no manner inconsistent with prior decisions. To be sure, various courts have held that tardiness in the presentation of claims for classification as a conscientious objector may, in some situations, provide a basis for an inference of insincerity. *See,* e. g., United States v. Messinger, 413 F.2d 927 (2d Cir. 1969); Salamy v. United States, 379 F.2d 838 (10th Cir. 1967). United States v. Jakobson, 325 F.2d 409 (2d Cir. 1963), *aff'd* sub nom. United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965). But in all of these cases, there was a substantial period of time during which the presentation of conscientious objector claims "might [have resulted] in the registrant being placed in a different classification." In such circumstances, the sincerity of the registrant's beliefs is indeed suspect; it is a rational inference that imminence of induction rather than relevance to classification led to their presentation. But Bornemann did not tarry over his claim in this manner; as soon as his beliefs were relevant to his classification, he presented them to his local board. We do not find apposite the other cases urged upon us by the government in support of the proposition that failure to present conscientious objection claims as soon as they mature, may be regarded as evidence of insincerity. Some of these cases do not involve the tardy presentation of long-matured claims, but rather the converse situation, the sudden crystallization of a claim immediately prior to induction. See, e. g.,

United States v. Corliss, 280 F.2d 808 (2d Cir.), *cert denied,* 364 U.S. 884, 81 S.Ct. 167, 5 L.Ed.2d 105 (1960). Although the sudden crystallization of conscientious objections is not *ipso facto* a sufficient rational basis for a conclusion of insincerity, see United States v. Gearey, 368 F.2d 144 (2d Cir. 1966), *cert. denied,* 389 U.S. 959, 88 S.Ct. 335, 19 L.Ed.2d 368 (1967), it is a factor to be weighed in the balance. In other cases cited by the government the question at issue was whether the registrant's beliefs conformed to the statutory standards, not whether he was sincere in in these beliefs. See United States v. Morico, 415 F.2d 138 (2d Cir. 1969).

■ Although the Supreme Court has made it clear that "the integrity of the Selective Service System demands, at least, that the Government not recommend illegal grounds," see Sicurella v. United States, 348 U.S. 385, 392, 75 S.Ct. 403, 99 L.Ed. 436 (1955), the core of our determination is not the recommendation of the Department of Justice but rather the decision of the Appeal Board. Gonzalez v. United States, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467 (1955). It is this decision which has final effect and cannot be overturned unless it lacks a basis in fact. Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946). Because we are unable to determine whether in reaching its conclusion of insincerity the Appeal Board relied on the improper ground urged by the Department of Justice or on other, permissible grounds, we do not dismiss the indictment; instead, we remand to the district court. Cf. United States v. Jakobson, 325 F.2d 409 (2d Cir. 1963), *aff'd* sub nom. United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850 (1965); United States v. Gearey, 368 F.2d 144 (2d Cir. 1966), *cert. denied,* 389 U.S. 959, 88 S.Ct. 335 (1967); United States v. Stafford, 389 F.2d 215 (2d Cir. 1968).

On remand, the government may attempt to prove by the testimony of the members of the Appeal Board that they did not consider what the Department of Justice regarded as suspicious laggard-

ness on the part of Bornemann, or that if they did take it into account, they had other independent grounds for their decision.[4] It is then for the district judge to determine whether these independent grounds supply the basis in fact necessary to support a conviction for refusal to be inducted into the armed forces.

4. In refusing to allow Bornemann to testify at trial as to his present religious associations, Judge Blumenfeld indicated that he would consider procedural irregularities in the administrative process, such as reliance on an impermissible ground, were they presented to him.

But as to the merits of his sincerity, that has been passed upon and not before me for review. If he wants to testify as to perhaps possibly some defect or deficiency in the hearing afforded to him, but just as to whether he is a member of a church and which one, I don't think that that would be anything that I'm entitled to consider.

We note that consideration of an improper ground may not have been the only factor which prejudiced Bornemann before the Appeal Board. The conclusions conveyed to the Board by the Department of Justice include the following statement: "A sufficient basis in fact exists to support the denial of the I-O classification to this registrant." Bornemann contends that this statement could have led the Appeal Board to deny him *de novo* review on his appeal. In our view, this most likely was not the intent or effect of the statement. Presumably, the Department of Justice meant this statement as no more than a prediction that a denial of Bornemann's appeal, following *de novo* consideration, would be upheld in the courts. Nevertheless, since we do not know whether the Appeal Board considered itself foreclosed from *de novo* review because of the faulted statement, its effect on the members of the Appeal Board would be another useful subject for inquiry on remand.