**UNITED STATES of America,**
**Plaintiff,**

v.

**Charles Edward GARDINER, Defendant.**

**69–CR–356.**

United States District Court,
E. D. New York.

Jan. 21, 1970.

Edward R. Neaher, U. S. Atty., Brooklyn, N. Y., for plaintiff, Edward John Boyd, V, Brooklyn, N. Y., of counsel.

Herman Adlerstein, New York City, for defendant.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

Upon completion of his non-jury trial for failure to submit to induction (50 U.S.C. App. § 462(a)), defendant moves for judgment of acquittal. For the reasons below, decision must be reserved and the matter remanded to the Selective Service System for further consideration, while this Court retains jurisdiction.

## I. FACTS

Defendant, Charles Edward Gardiner, registered with his local Selective Service board in 1962. At that time, he made no claim to conscientious objector status. Until August, 1966, he was classified II–S, as a student. Although a student, he was then reclassified I–A. An order to report for induction was sent January 17, 1967, but was rescinded simultaneously by the action of the local board in classifying him I–S, as a student entitled to complete the school year. In May of that year, defendant submitted Form 150, the Special Form for Conscientious Objector. In this form and its accompanying twelve typewritten pages of explanatory material, defendant requested a I–O classification, as a conscientious objector available for non-military national service.

The defendant summarized his opposition to participation in, or support of, war in any form by stating in part:

Consequently, I admit my obligation to law, and more specifically to my country, but unhesitatingly declare my precedent and superior responsibility to act in a manner consistent with my conscience, with the message I receive from the Bible, and from all other methods of awareness of the demands made upon me by the Supreme Being. In any conflict of loyalties, I must declare my greater loyalty to Christ and to his way. * * * I not only refuse to carry or use and [sic, any?] object designed and intended to inflict harm or incite fear in another human being, but I as conscientiously and as heartily refuse to act in any position of support, direct or indirect, of those who do use such objects.

He traced the development of his religious beliefs, beginning with his family, and categorized this training as "predominantly within the tradition of conservative, fundamentalist Christianity." Major influences upon his development as a conscientious objector included early religious association with the Baptist Church, the example of his parents, and education at Houghton College, a Wesleyan Methodist institution, where he regularly participated in religious activities. He stated that he had not engaged in vocal expression of his beliefs, expressing a desire to "avoid the street corner praying (Matthew 6:1–7)" and a suspicion "of street corner conscientious objectionism." Throughout, there is a rejection of the concepts of force or violence.

At the same time that this material was submitted, the Rector and his Assistant Minister at the Church which the defendant attended at graduate school wrote the local board to express their belief in the validity and sincerity of the defendant's claim. The only evidence in the file scrutinized by the local board that tends to cast any doubt on the defendant's claim is an ambiguous letter written by the Dean of Students of Houghton College, which reads in part:

I have been giving the matter before me serious thought and have reached a decision other than I thought was possible when last we talked on the

telephone. I am sorry that I cannot help you in this matter. * * *

Had it been that you would have demonstrated the kind of image here on Houghton College campus that you now attempt to describe, I might well have been able to help you with this matter. However, as you are no doubt well aware, as I have given myself time to reflect upon your years with us here, I cannot satisfy myself that I could sincerely feel that I was sharing the whole truth.

This letter is to be contrasted with that of a Minister of the Church which the defendant attended while at graduate school, Edward A. Dougherty, Jr., who wrote, in part:

> I have known Mr. Gardiner for over 2 years and remain convinced of his sincerity, depth of conviction and religious motivation. I have known Mr. Gardiner as his Minister and friend and do not understand how he could be refused a I–O classification.
>
> Mr. Gardiner attended religiously sponsored schools, was raised in a conservative Baptist home, and has continued to maintain his religious convictions in the midst of a student body in which maintenance of a conviction is *not* the thing to do. Mr. Gardiner has always been a total pacifist which, again, is not a popular, nor easily maintained conviction. He has told me recently that he is more than willing to accept non-military alternative service at any time.
>
> * * * * * *
>
> His own church has backed him in his position and it is clear that he is not going to alter it even under penalty of prison. Of all the people I know he seems to qualify under the law for I–O classification.
>
> * * * * * *
>
> [H]e does have a depth of conviction based on religious training that is unusual in students today. (Emphasis in original.)

A number of his professors concurred in this evaluation.

Upon receipt of the information that the defendant was no longer a student, his local board classified him I–A on December 14, 1967. On February 14, 1968, a personal interview of the defendant and the Reverend Arnold Williamson, Pastor of the Manhassett Baptist Church, was conducted by the local board. In addition to verbal information, the defendant submitted additional information in writing that evening, reinforcing and reiterating his claim to conscientious objector status. He wrote:

> I am not able to accept the contradictory, externally imposed orders of the Old Testament, that in this situation thou shalt not kill while in that situation thou shalt, with moral approval for both actions. Instead, I am able to be guided only by Christ's exemplary order: you love as I have loved you. As that relates to service in the armed forces I am only able to translate that order into a simple promise of action: I cannot and I will not intentionally take another man's life. I cannot and I will not, regardless of the end involved, its propriety, even its "morality", intentionally maim, nor can I nor will I in any way knowingly conribute [sic] myself or my services to the support of those who are willing to do so.
>
> In the past year I have not supported the immediate military effort by paying federal income taxes. I have not accomplished this by refusing to pay all or part of the tax, but by refusing to earn a taxable amount. I have avoided the use of the telephone for calls subject to the war tax surcharge. I have used neither tobacco nor alcohol, avoiding the same tax surcharges. I am mentally prepared to go on from there. When and if it becomes apparent that it is impossible to avoid supporting an effort (any effort) which is morally repulsive, I will choose, with great regret, to leave the country. With great regret because I believe myself far more able to serve my country and its people from within its boundaries than from a distance. But

service from a distance, even service so small as to be inapparent, I hold to be more worthwhile than the disservice I would do to myself and to my country in committing what are to me morally repulsive acts.

I am not merely willing to serve. I will serve—from within a federal prison, from outside of the country, from within the limits of approved alternative service, from wherever I am able, in a quiet, noncompulsive, perhaps non-concrete manner. The confines, even the forms of that service are not of great importance to me. I do not ask for a great deal of preordination, only that my actions, whatever they are, be ordained in love.

Pastor Williamson, who had been acquainted with the defendant as his family's minister for many years, testified at the trial, and this Court finds that he so testified before the local board, that the defendant was a deeply religious individual, strongly committed to his beliefs, perhaps confused, but certainly sincere. He indicated personal disagreement with the defendant's religious conclusions, but recognized their religious nature. For some years Pastor Williamson had entertained the hope that defendant would join the ministry. He offered testimonial support to the defendant's claims about his religious upbringing and family influences, dating back for more than 15 years.

Nevertheless, the local board classified the defendant I–A, available for combatant military service. An appeal was taken from this decision to the New York State Appeal Board. The "Summary of Appearance Before Local Board," prepared by the local board and submitted as part of the defendant's file to the Appeal Board, contained approximately 200 words, largely paraphrases of eight questions asked of the defendant and his answers. At most, two of these deal with the defendant's conscientious objector claim; two others elicited the information that the registrant himself had prepared the additional information submitted that evening. One of

the two questions arguably relating to the defendant's conscientious objector claim relates to a statement by a board member that "if there is no alternative you will have to leave the country." This appears to be a reference to a statement made in the material submitted that evening, and is taken out of context. The summary of Pastor Williamson's declaration is even more abbreviated.

No reason for denial of conscientious objector status is given in the local board's summary; there is no indication that the applicant's veracity was suspect. On the face sheet of the local board's summary are two mimeographed conclusions with respect to sincerity and time of maturity of the applicant's beliefs; neither was checked. Under "Action taken by local board" there was checked the phrase "The registrant's classification was not reopened."

On this record, the Appeal Board affirmed the decision of the local board. The defendant was eventually ordered to report for induction on September 4, 1968. Although he reported on that day, the defendant refused to submit to induction, and this criminal prosecution followed.

## II. NECESSITY OF FURTHER FINDINGS

█ The United States asserts that it is not open to this Court to consider the validity of the classification underlying defendant's order to report for induction. This contention is apparently based upon the ground of failure to exhaust administrative remedies. Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305 (1944). It is suggested that the time to appeal the determination of the local board came when that board first classified defendant I–A, before it issued and rescinded the order to report for induction on January 17, 1967. Having decided adversely to the defendant's student deferment claim at that time, the local board, it is argued, was under no obligation to reopen and reconsider the claim to conscientious

objector status. 32 C.F.R. § 1625.2 (1969).

This argument is without merit. First, there was no outstanding order to report for induction at the time defendant submitted his request for conscientious objector status. Pursuant to 32 C.F.R. § 1625.3 (1969), the local board had cancelled its notice of induction and reclassified defendant I–S. It would be a strained construction of the regulations involved to suggest that if, at any time, an order to report for induction has been issued to a registrant—through clerical mistake, board error reversed by higher administrative or judicial authority, or a valid but reconsidered board decision—that registrant may not subsequently raise a claim to conscientious objector status without first establishing a change in status resulting from circumstances beyond his control.

■ Second, even if the order issued January 17, 1967 were outstanding within the meaning of 32 C.F.R. § 1625.2 (1969)—a thesis this Court rejects—a local board's decision not to reopen could not be made without a board finding that the defendant's beliefs had crystallized prior to issuance of the induction order. No such finding was made. In the face of the statement by the registrant that his beliefs had matured at about the time he had received that notice to report for induction, such a finding would be required. United States v. Gearey, 368 F.2d 144 (2d Cir. 1966); United States v. Stafford, 389 F.2d 215 (2d Cir. 1968); United States v. Holmes (2d Cir. 1970).

■ Third, the actions of the local board in granting the registrant a personal appearance under 32 C.F.R. § 1624.1 (1969), in failing to send a notice of refusal to reopen as required by 32 C.F.R. § 1625.4 (1969), in sending the registrant a new classification form, apparently under 32 C.F.R. § 1625.11 (1969), and in permitting an appeal to the Appeal Board under 32 C.F.R. § 1626.2 (1969), constituted, as a matter of law, a reopening and reconsideration of the defendant's claim. Witmer v.

United States, 348 U.S. 375, 383–384, 75 S.Ct. 392, 99 L.Ed. 428 (1955); Miller v. United States, 388 F.2d 973 (9th Cir. 1967); United States v. Vincelli, 216 F. 2d 681 (2d Cir. 1954); United States v. Westphal, 304 F.Supp. 951 (D.S.D. 1969); United States v. Clark, 105 F. Supp. 613 (W.D.Pa.1952). The Selective Service System thus recognized that its earlier order to report for induction was of no effect, and the reopening constituted "a waiver by the board of any requirement of Regulation 1625.1(b) that the [registrant] report his change of status within ten days of his 'conversion.'" United States v. Vincelli, *supra*, 216 F.2d at 682.

■ This distinguishes the case at hand from United States v. Holmes (2d Cir. 1970). There, the claim for conscientious objector status was presented after an outstanding induction order had been issued, and the local board was required to find at what point the beliefs of the registrant had matured, in addition to whether they were sincerely held and in conformity with the statutory requirements. Here, with a *de facto* reopening, all that was necessary for the board to determine was whether the defendant's beliefs were sincerely held and whether they met the requirements of the law. The point at which these beliefs crystallized or matured was irrelevant, since, at all times, including the time at which he applied for conscientious objector status, the defendant was classified—or entitled to be classified—in a category lower than I–O. United States v. Bornemann, 424 F.2d 1343 (2d Cir. 1970). See also United States v. Vincelli, 216 F.2d 681 (2d Cir. 1954) (waiver).

■ Even though the defendant made out what appears to have been a prima facie case as a conscientious objector, the local board did not, so far as the record discloses, make any determination as to the nature of the registrant's beliefs or their sincerity. Having failed to make such a finding, the local board's —and the Appeal Board's—orders do not provide a predicate for criminal conviction and a judgment of acquittal

should follow. *See* United States v. James, 417 F.2d 826 (4th Cir. 1969); United States v. Washington, 392 F.2d 37 (6th Cir. 1968); *cf.* Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L. Ed. 428, 12 (1955); United States v. Corliss, 280 F.2d 808 (2d Cir.), *cert. denied,* 364 U.S. 884, 81 S.Ct. 167, 5 L.Ed. 2d 105 (1960); Franks v. United States, 216 F.2d 266, 269 (9th Cir. 1954). Nevertheless, the Second Circuit has apparently taken the position that this conclusion does not end the matter. In a number of cases it has held, in effect, that the district courts should retain jurisdiction while attempting to ascertain the basis for local and appeal board action.

One suggestion of the Court of Appeals for clarifying the record is for the District Court to take the testimony of local or appeal board members. United States v. Bornemann, 424 F.2d 1343 (2d Cir. 1970); United States v. Stafford, 389 F.2d 215 (2d Cir. 1968); United States v. Gearey, 368 F.2d 144 (2d Cir. 1966); *cf.* United States v. Morico, 415 F.2d 138, 142–144 (2d Cir. 1969). This approach should be avoided wherever possible. It would mean that board members, private, part-time volunteers, would in many cases be called to testify. The court, rather than reviewing the basis of their decision, would be passing on their credibility. The job of selective service board members, onerous as it now is, would become almost impossibly unattractive and burdensome. Moreover, the court would not be reviewing the record of the appeal board but making a new record itself. Such a procedure might be necessary in certain cases, as, for example, where the honesty of the classification process is drawn into question, or where procedural fairness is in doubt. *See, e. g.,* United States v. Bowen, 414 F.2d 1268 (3d Cir. 1969); United States v. Davis, 413 F.2d 148 (4th Cir. 1969); Faulkner v. Clifford, 289 F.Supp. 895, 903 (E.D.N.Y.1968). It does not appear to be necessary at present in the instant case.

A second alternative appears to have been established by the Second Circuit. In a recent case, United States v. Holmes (2d Cir. 1970), it held that the court should retain jurisdiction while the Selective Service System clarifies and corrects its record. This procedure, while curious—permitting as it does conviction of the defendant on an administrative record made after indictment and trial—minimizes the dilemmas faced by the courts in seeking to apply minimal standards of review to the work of laymen whose hearing procedures and knowledge of the law varies among local boards. *See, e. g.,* United States v. Atherton (9th Cir. 1970); United States v. Martin, 416 F.2d 44 (10th Cir. 1969); United States v. St. Clair, 293 F.Supp. 337 (E.D.N.Y.1968); United States v. Tittlerud (D.Minn.1969). *See also* United States v. Back, 409 F.2d 1318, 1320 (2d Cir. 1969); United States v. Corliss, 280 F.2d 808, 814–815 (2d Cir.), *cert. denied,* 364 U.S. 884, 81 S.Ct. 167, 5 L.Ed.2d 105 (1960); Reisner, The Conscientious Objector Exemption: Administrative Procedure and Judicial Review, 35 U.Chi.L.Rev. 686, 714–719 (1968). Since the burden upon the Selective Service System will not be great under this Circuit's remand procedure, it is adopted in the instant case.

The matter is remanded to the Selective Service System, including local and appeal boards, for such consideration and such findings as it deems necessary in the light of this opinion. Unless a corrected selective service record is submitted within sixty days, a judgment of acquittal will be entered. Upon filing of a corrected record, the case will be reopened to permit either party to submit such evidence as may be relevant. *Cf.* United States v. Sandbank, 403 F.2d 38, 40 n. (2d Cir.), *cert. denied,* 394 U.S. 961, 89 S.Ct. 1301, 22 L.Ed.2d 562 (1969).

So ordered.