**UNITED STATES ex rel. Cary E. DONHAM, Petitioner,**

v.

**Stanley R. RESOR, Secretary of the Army, et al., Respondents.**

**No. 70 Civ. 3363.**

United States District Court,
S. D. New York.

Sept. 3, 1970.

Rabinowitz, Boudin & Standard, New York City, for petitioner; Joan Goldberg, New York City, of counsel.

Whitney North Seymour, Jr., U. S. Atty. for Southern District of N. Y., New York City, for respondents; Michael I. Saltzman, Washington, D. C., of counsel.

## OPINION

FRANKEL, District Judge.

Petitioner, at the end of his third year at West Point, sought separation from the Corps of Cadets on the ground that he had matured conscientious objections to military service. The Army has denied his application. He sues here for a writ of habeas corpus, claiming that the adverse decision of the military authorities lacked the requisite basis in fact.[1]

---

1. Both sides agree that this ultimate contention is now ripe for decision upon the record before the court. Arguable questions about the court's jurisdiction have been foregone by the government, reflecting a view the court finds sound. See United States ex rel. Brooks v. Clifford, 409 F.2d 700, 706–707 (4th Cir.

1969), collecting cases from the Second and other Circuits.

As the case originally came on for the present decision, petitioner was seeking to enjoin proceedings for his separation upon grounds of insufficient "aptitude" (i. e., unsuitable attitude) for commissioning as an army officer. It has become

The case appears to be the first in which a cadet has claimed the kind of dramatic change in outlook and ambition petitioner asserts. Apart from what this might be thought to symbolize about our world in more general terms, the uniqueness of the problem could have generated some finicky legal questions of both substance and procedure. But all concerned have concurred in adapting existing administrative procedures to petitioner's case, and it has been for the most part undisputed (but see note 2, *infra*) that substantive doctrines developed mainly in selective service cases are applicable. We proceed to the merits on this basis.

## I.

As his brief observes, petitioner built in three full academic years, a "splendid record at the military academy * * *." He stood in the top fifth of his class. He was a squad leader in his junior year. So far as those in charge of his education and status were informed, he was completing successfully the training for a career as a professional army officer.

On May 29, 1970, however, he filed his application for discharge as a conscientious objector. In it he stated that his "beliefs concerning war stem from a belief in God and in the New Testament teachings of Christ." Citing the New Testament and other writings, he wrote that he believed himself to have "no right to take the life of any other person * * *." "Yet," he continued, "in the army, one is taught that killing is not only necessary but also acceptable. For example, part of the mission of the infantry is to 'close with and destroy the enemy.'" Quoting from Thoreau, psychiatrist Jerome Frank, and others, he went on to detail his commitment to love and peace and his rejection of war and killing.

He recounted his steady devotion since early childhood to the activities and doctrines of the Methodist Church. At the same time, he said, "West Point has been a goal of mine for many years"— for the "prestige," because it "provided a way to serve the country," because, in sum, it "seemed to offer everything worthwhile in an education."

However, he continued, the reality of West Point was disturbing to him from the outset:

"I was somewhat suprised * * * to learn that I had to undergo training with a bayonet and shout enthusiastically that the spirit of the bayonet was 'To kill, sir!' This was not exactly what I had expected, and it made me somewhat uneasy. However, at the time, actual combat duty was four years away, distant enough to make it seem much less important than the day-to-day struggle of New Cadet Barracks. Also, I decided that I would not be an infantry officer, whose job emphasized the hand-to-hand combat portion of the Army. I believed that I could better serve in a branch not so close to the actual fighting. Finally, the positive aspects to be gained from a West Point education seemed more important that [*sic*] a few words I was required to say. * * * Now I realize that all members of the Army, even those not engaged in actual combat, take part in the killing of others, since to be a member, even in a non-combatant role, is to condone the actions of the entire organization, which I cannot in conscience do."

Petitioner went on in his application to describe how the doubts "would sometimes return;" how he "pushed [them] to the back of [his] mind;" and how they "did not surface again seriously until the summer between [his] sophomore and junior years." In that summer, almost a year before his filing of the in-

common ground, however, that the injunction motion is academic. That would be patently true if habeas were granted. It is equally true under the decision herein denying the petition; petitioner plans in this situation to tender his resignation, and the government has stated that it will be accepted.

stant application, he "was on the teaching end of the bayonet, training incoming plebes to kill people." Once more he found himself thinking "sombre thoughts," but again he "closed [his] eyes" and went on with his duties as squad leader. He concluded that he would serve in a branch of the army which "did not actually participate in the close combat." By September of that year, he stated, he was "not certain of what [he] believed; [he] only knew that much of Army duty was distasteful to [him]."

During the fall he continued his readings, his application said. Then, the Vietnam moratorium and "the news of the Mylai incident * * * both had a profound effect on [him]. These, coupled with the news that one of the boys [he] graduated from high school with had been killed in Vietnam, made [him] realize that people really die in wars * * * and [he] began to wonder why." He was now made to "realize coldly" that he was being prepared for war, and that "[a]fter four years of college, [he] would be able to lead men in combat * * *." He also found himself recoiling from the realization that he was expected to enjoy his career in combat. He says he found himself "frightened" and confused by these ideas. He discussed them with the chaplain. He prayed and thought a great deal. Then, he "concluded that there is no way to reconcile the concept of loving one's neighbor and war." After describing a course of further thought and soul-searching, the application stated, the petitioner concluded that his conscience called upon him "to reject war as a means to any end, and instead to substitute love."

The remainder of the application, though all of it is relevant, may be more briefly summarized. Petitioner went on to describe the limited degree to which he might believe in the use of force. He amplified his description of the course of his religious thought and beliefs, setting out some poems he had written during the preceding year or so as reflec-tive of the cast of his mind. He noted that the application he was now presenting was opposed by his parents, and urged this among other things as a demonstration of the sincerity of his beliefs. As to whether he had ever "given public expression" to the views now stated, he said these views had "been expressed only in private conversations and writings."

Accompanying the application were letters from petitioner's home-town pastor, a high school teacher and coach, roommates at the Military Academy, instructors at a local college near the Academy, and others. All attested to the petitioner's integrity, honesty and sincerity.

The Assistant Chaplain of the Academy submitted his views on the application. He stated that he believed Cadet Donham "to be sincere in his convictions and to be a young man of integrity."

As a further step in the procedure, the petitioner was seen for psychiatric evaluation. The Chief of the Academy's neuropsychiatric service reported that he suffered from no "emotional disturbance or psychiatric disease." In addition, while recognizing that it was "not the purpose of [his] office to judge the sincerity or validity of Conscientious Objector arguments," the medical officer wrote that "it would nevertheless appear warranted to state that Cadet Donham's convictions are based on considerable reasoning and cogent thought processes."

On June 16, 1970, petitioner appeared before Lt. Col. J. E. Gleason for a personal interview on his application. Counsel for petitioner attended with him and made a transcript of the conversation which was later before the ultimate decision-makers in the military hierarchy and before this court. Petitioner on this occasion summarized orally the beliefs stated at greater lenth in his written application. He was asked by Colonel Gleason to "name * * * all" the writers to whom the application referred and to tell how they had affected his beliefs. In answer to other ques-

tions he said that he had tried to read on both sides of the subject before reaching his ultimate conclusion. He told once more about his doubts long before the time of his application and about his successful quelling of them while he went on through the completion of the third academic year. When asked whether he had considered that he was compromising himself, he said that he believed "this was something [he] would get use [*sic*] to." Continuing on the subject of the delay in reporting his feelings of conscience, the interview summary of petitioner's counsel contains the following colloquy:

"Col. Gleason: When did you indicate to chain of command that this was the course of action you had decided to take?

"Mr. Donham: After final examinations.

"Col. Gleason: Why did you wait until after the final examinations?

"Mr. Donham: I did not know whether I would be permitted to finish the school year."

The interview with Colonel Gleason proceeded to other matters not necessary to recount in detail. At the conclusion the Colonel observed that he was "still not satisfied that Mr. Donham is opposed to all war." He volunteered his "own feeling \* \* \* that an army is necessary in order to keep the peace and this is the main purpose of the army."

Colonel Gleason then prepared a report dated June 18, 1970, concerning the interview with petitioner and the Colonel's conclusions and recommendations. He recommended disapproval. He noted that the petitioner's decision to seek discharge as a conscientious objector had been reached in February, 1970, and reported then, in confidence, to a cadet counsellor. He recounted further that petitioner had retained civilian legal assistance in March, and then noted that the request for discharge had not been submitted until the end of May. He emphasized the petitioner's explanation that the delay was motivated by his de-

sire to obtain academic credit for the courses taken in his third year. The Colonel found that the "delay indicates insincerity, as on one hand he states he cannot serve in the Army, even as a non-combatant, yet he willfully, for personal advancement, remained associated with the Academy and actively participated in all training for approximately four months subsequent to his decision."

Colonel Gleason went on to express his view (excluded in the final decision) that petitioner "has not developed his claimed convictions through religious training and beliefs." He criticized the adequacy of petitioner's knowledge about the literary sources to which the application referred. He suggested that petitioner had first chosen to claim conscientious objector status "and then sought literary material to support the decision."

Then, reporting on the question of when petitioner might think force appropriate, the Colonel summarized his questions to petitioner about World War II and, specifically, the killing of Jews during that conflict. The Colonel gave it as his impression that petitioner "would not have been opposed to participation in that war."

Colonel Gleason expressed his opinion that petitioner's "decision stems from an objection to the Vietnam war because of the personal risks that are now apparent and real." He noted that the beliefs expressed in petitioner's application had not been expressed or claimed through the years of military training, including intensive training as both student and teacher in techniques of killing in combat. He commented unfavorably upon petitioner's recent hope that he could avoid the problem by attending graduate school and seeking an assignment to some area of the service not involved in combat.

Proceeding through military channels, petitioner's application was next considered by the Commandant of Cadets. That official recommended to the Superintendent that the application be denied

on the ground that it was "prompted not by any sincere, bonafide, deep-rooted conviction but by [petitioner's] desire to avoid obligated service." On the next day the Superintendent concurred in the recommendation of disapproval and sent the file along to the Department of the Army.

The final and authoritative decision was made and reported in a written opinion of July 21, 1970, by the Department of the Army's Conscientious Objector Review Board. The Board held that petitioner's application must be denied. The exclusive ground of this determination was the conclusion that petitioner "lacks the depth of sincerity to qualify for discharge as a conscientious objector * * *." This finding, the opinion states, "is based on an objective analysis of facts found in the record." The Board found that petitioner's fundamental beliefs on the subject of central concern were not essentially different now from what they had been when he first entered the Academy. It emphasized petitioner's repeated references to his interest in obtaining a West Point education. The Board observed that "it appears from the record that this fact has apparently had a strong influence on the timing of [petitioner's] declaration of conscientious objection." The Board quoted at some length from the passages in petitioner's application expressing his surprise to learn that he would undergo training in the Military Academy in the techniques of killing people in wartime. It quoted the passages where petitioner expressed his long-held hope that he could or would arrange to serve in some non-combatant capacity. The Board found that the initial failure of the petitioner to make his doubts "known to the proper officials" was at first "fully understandable," but that "his continued failure to express such growing feelings for over a period of two and one-half years makes his motives in not doing so suspect."

Returning to the repeated statements of petitioner that he planned to serve in areas outside of combat, the Board found that these "self-serving plans and aspirations cast * * * doubt as to the reason for his delay in expressing what [he] claims were long-held feelings." The Board quoted the passage in his application where petitioner told of the growing disturbance in his mind over the conflict in Vietnam and his personal acquaintance with a young man killed there, emphasizing the following sentences:

"* * * The moratorium made me realize coldly that I was preparing for war and really nothing more. After four years of college, I would be able to lead men in combat; in addition, I was expected to look forward to it, and enjoy it."

Commenting on the quoted words and others to the same tenor in petitioner's application, the Board said:

"* * * The naivete of these statements, coming from an intelligent young man who had already spent two years at West Point, creates further doubt as to the extent to which his beliefs are truly held. As expressed in Parrott v. United States: 'An average man of average intelligence who can read must daily realize that he may, once he is subject to a draft call from his local board * * * be soon called upon to kill.' A U.S. Military Academy cadet who has spent over two years at the Academy certainly cannot be equated in knowledge of such matters with an average draftee, who conceivably might *not* know about the more necessary (albeit unpleasant and unfortunate) aspects of Army duty. Coming from a man with Donham's background, this statement is simply not believable."

The Board then referred in a similar vein to the colloquy (quoted *supra*) from the interview transcript prepared by petitioner's counsel where he explained the reasons for his delay from March to May in filing his application. The Board stressed in this quotation petitioner's statement that he was concerned about whether "he would be permitted

to finish the school year." Regarding this, the Board said:

"* * * The * * * quotation clearly indicates that Donham's professed beliefs are not deeply held. Although his doubts about serving in the Army and participating in war (which had begun early in his stay at West Point) had finally led Donham to the conclusion that he was required beyond all doubt by his conscience to request discharge, he did not hold his beliefs so strongly that he could not wait until the end of the semester, so that he could obtain credit for the full academic year. It would seem that if Donham held his beliefs as deeply as he professes, he would have felt bound to apply at the time he made his decision. Thus, he appears to have been more concerned with earning credit for his schooling than in following the dictates of his conscience. This theme runs throughout Donham's narrative description of the acquisition of his beliefs. His goal was to obtain an education."

In sum, upon the single ground that petitioner had not displayed the requisite sincerity in his asserted convictions, the Board rendered the decision of disapproval which has been followed by his application to this court for a writ of habeas corpus.

## II.

Petitioner's counsel has argued that the full record of his views—not exclud-

ing the doubts, the evidences of what the Board called naivete, and even the seemingly calculated delay in making his application—is consistent with the deep sincerity he has been held by the Army Board to lack. The substantial point is made that petitioner's candor in stating facts permitting adverse inferences is not the least of the factors in his favor. The brief for petitioner stresses the "long list of reference letters [indicating] that people who have known petitioner most of his life, as well as those who have become acquainted with him more recently, believe that he is honest and sincere, a young man of deep convictions and a person who is not afraid to stand by his beliefs." Perhaps less cogent, but at least piquant, is the contention that petitioner's "splendid record at the military academy, which operates under an honor system, is further evidence of his integrity."

■ Taking them all together, petitioner's arguments might prevail if this court were commissioned to decide independently his application for discharge from West Point as a conscientious objector. But the court's role is a far more straitened one. As stated in petitioner's main brief, the judicial function here "is the limited one of determining whether there was a basis in fact for finding that he was not a conscientious objector * * *."[2] More specifically, the question is whether the Conscientious Objector Review Board could rationally and honestly have concluded from the facts before it that petitioner

2. That familiar standard of sharply restricted review derives from selective service cases. E. g., Estep v. United States, 327 U.S. 114, 122–123, 66 S.Ct. 423, 90 L.Ed. 567 (1946). Both sides joined originally in proposing its application here.

Then, however, counsel for petitioner asked leave to file a post-hearing memorandum on points she said were first confronted in the government's opposing papers. Granted such leave, she argued some things for which leave had been sought, then added as a final point an argument (available from the outset, but now substituted for the flatly contrary

position theretofore taken) that the "no-basis-in-fact" standard is unconstitutional as applied to her client. The argument is rejected.

Another contention raised for the first time in the post-hearing memorandum—and likewise entirely outside the area for which such a memorandum was allowed—is that the Army violated its own regulations because the papers forwarded to Washington lacked a recommendation from petitioner's "unit commander." The government understandably objects to consideration of this afterthought at all, but amply refutes it in any event.

had not demonstrated the requisite sincerity of his asserted convictions. United States v. Corliss, 280 F.2d 808, 814–815 (2d Cir.), cert. denied, 364 U.S. 884, 81 S.Ct. 167, 5 L.Ed.2d 105 (1960).[3]

Thus understood, the problem is not a difficult one. The Board cannot be held to have been irrational or itself insincere when it found on this record an insufficient basis for finding petitioner sincere in his professed views.

■■ While sincerity "is, of course, a question of fact," United States v. Seeger, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), it is a complex and subtle one on which no single "fact" is likely to be decisive. There are, nevertheless, indicia taught by the general experience of men and the specific run of cases touching the area of present concern. Prudence and circumspection in revealing beliefs about fundamental things need not necessarily reflect a lack of sincerity. Here, however, while petitioner postponed disclosure, he continued to serve in an establishment and learn and teach things he then claimed to find intolerable as a matter of conscience and basic conviction. The Board was not irrational when it counted heavily against petitioner the delay (including the final period for completing his third year's work) in submitting his application. This is not the first case in which long delay, unimpressively explained, has been a factor adverse to claims like petitioner's. Cf., e.g., United States v. Messinger, 413 F.2d 927, 930, 932 (2d Cir. 1969), cert. denied, 399 U.S. 927, 90 S. Ct. 2230, 26 L.Ed.2d 792 (1970); Paszel v. Laird, 426 F.2d 1169, 1175 (2d Cir. 1970); Salamy v. United States, 379 F. 2d 838, 842 (10th Cir.1967).

The Board was not less within the realm of allowable judgment when it weighed against petitioner the notable length of time he claimed to have required to comprehend the nature and purpose of his West Point training. His initial reaction to West Point in this era of movies and television—that he was "somewhat surprised * * * to learn that [he] had to undergo training with a bayonet"—could have been in itself hard for the Board to swallow. His later assertion that it took him over two years at the Academy to "realize that people really die in wars" was held to be an incredible assertion of naivete. Petitioner's counsel treats these and other statements of like tenor with the observation that we recognize today the frequently large gap between intellectual and emotional "understanding." The

3. Petitioner's counsel focuses primarily on the vulnerabilities in what Colonel Gleason wrote and said. If the Colonel's expressions constituted the decision to be reviewed (or, what is the same thing, had the decision been for him to make), petitioner would stand on high ground. That is not the case, however, and it is not useful to discuss the seeming misconceptions in what the Colonel wrote. The decision of the Board, deliberately complete and sharply limited to the single ground now in issue, appears explicitly to avoid the Colonel's disputed observations. At any rate, it neither adopts nor is in any way impaired by them. Cf. United States v. Bornemann, 424 F.2d 1343, 1348–1349 (2d Cir. 1970); United States v. Messinger, 413 F.2d 927, 930–931 (2d Cir. 1969).
Petitioner's position in this respect is not enhanced by the variant formulation that the Army violated its own regulation, Department of Defense Directive 1300.6 (May 10, 1968), which provides that the officer in Colonel Gleason's role should be one "knowledgeable in policies and procedures relating to conscientious objector matters." No question of this sort was raised before or during the interview with Colonel Gleason. He was qualified by rank and by his membership in the Adjutant General's Corps, which normally is charged with such duties. See Reitemeyer v. McCrea, 302 F.Supp. 1210, 1217–1218 n. 5 (D. Md.1969). The argument now made is said to derive support from the fact that the Colonel made legal errors, including an asserted misinterpretation of a Supreme Court decision announced three days before the date of his report. Even for judicial officers, with power to decide authoritatively (unlike the Colonel), it is not the law that errors are disqualifying in the impossible sense of petitioner's theory.

court accepts the point as a substantial one. The Board, however, was not required to treat it as either a sufficient or even a very weighty one in all the circumstances of this case. The Board was permitted to conclude, as it did, that the asserted lack of sophistication of this intelligent cadet exposed a level of disingenuousness incompatible with his profession of sincerity.

The other details supportive of the military decision are adequately stated in the precisely circumscribed opinion of the Board. Considering its decision as a whole upon the record as a whole, the court finds that the result here assailed stands firmly upon the required basis in fact.

■ A section of petitioner's post-hearing memorandum (pp. 21–22) asserts that the Review Board's decision must be nullified because it misses the "proper standard" when, instead of saying "petitioner lacks sincerity," it says he "lacks the *depth* of sincerity to qualify for discharge." (Petitioner's emphasis.) The reference to "depth," petitioner says, is a mistaken importation of an unconstitutionally vague criterion. The argument is not substantial.

The notion of "depth" of conviction is neither novel nor questionable in this context. To cite only a recent reminder from the Supreme Court, the central concern relates either to traditionally religious beliefs, like those petitioner professes, or at least to "beliefs * * * held with the strength of traditional religious convictions." Welsh v. United States, 398 U.S. 333, 340, 90 S.Ct. 1792, 1796, 26 L.Ed.2d 308 (1970). It is apt, therefore, as the same opinion reflects, in judging the "strength" with which beliefs are held, to state the question and answer in terms of whether the "individual *deeply* and sincerely holds" the beliefs. *Id.* (emphasis added). Far from being a mistake or a novelty, it is sound and familiar to identify the vital quality of conviction in terms of "sincerity and depth" (*id.* at 337, 90 S.Ct. 1792), "strength" (*id.*), whether the beliefs are "sincere and meaningful" (*id.*

at 339, 90 S.Ct. 1792) and "deeply held" (*id.* at 344, 90 S.Ct. 1792). See also *id.* at 342, 343, 90 S.Ct. 1792.

It seems clear without more that petitioner's attack upon the Board's choice of words is a waste of time. Beyond the abstractly semantic terms in which the argument is presented, the context supplies more thorough refutation. The Board revealed pervasively that its focus was correct. It expressed its judgment that petitioner's "motives [were] suspect;" it identified specific grounds for doubting his stated reasons for delaying his application; it found in this aspect of the record evidence that his beliefs were "not deeply held;" it noted his "naivete" about what West Point taught, and found this a basis for "further doubt as to the extent to which his beliefs are truly held;" it judged his assertion about the time it took him to "realize" this to be "simply not believable." The Board, like the Supreme Court, repeatedly indicated the test as being how "strongly" or "deeply" petitioner held his asserted beliefs, and found his application insufficient in these terms. The supposed defect in its phraseology is in no sense a substantial point.

For the above reasons, the petition for a writ of habeas corpus is denied.

So ordered.